Thomas L. Simek (DC Bar #57268)
Anthony C. Biagioli (MO Bar # 72434)
Attorneys for Plaintiff
COMMODITY FUTURES TRADING COMMISSION
2600 Grand Boulevard, Suite 210
Kansas City, MO  64108
Telephone: (816) 960-7700
tsimek@cftc.gov
abiagioli@cftc.gov

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| Commodity Futures Trading Commission, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiff, | |
| v. | |
| Ooki DAO (formerly d/b/a bZx DAO), an unincorporated association, | |
| Defendant. | |

**CIVIL ACTION NO:  3:22-cv-5416**

**Hon._____**

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), for its Complaint against Defendant Ooki DAO ("Ooki DAO" or "Defendant"), formerly doing business as the bZx DAO ("bZx DAO"), by and through its attorneys, alleges as follows:

## I.    SUMMARY

1.      From approximately June 1, 2019 to approximately August 23, 2021 (the "bZx Relevant Period"), bZeroX, LLC ("bZeroX") designed, deployed, marketed, and made solicitations concerning a blockchain-based software protocol (the "bZx Protocol") that accepted orders for and facilitated margined and leveraged retail commodity transactions (functioning

- 1 -

similarly to a trading platform).  The bZx Protocol permitted users to contribute margin

(collateral) to open leveraged positions whose ultimate value was determined by the price

difference between two virtual currencies from the time the position was established to the time

it was closed.  The bZx Protocol purported to offer users the ability to engage in these

transactions in a decentralized environment—i.e., without third-party intermediaries taking

custody of user assets.  In so doing, bZeroX—which had never registered with the

Commission—unlawfully engaged in activities that could only lawfully be performed by a

registered designated contract market ("DCM") and other activities that could only lawfully be

performed by a registered futures commission merchant ("FCM") under the Commodity

Exchange Act (the "Act"), 7 U.S.C. §§ 1-26, and Commission Regulations ("Regulations"),

17 C.F.R. pts. 1-190 (2021).  In addition, bZeroX failed to conduct know-your-customer

("KYC") diligence on its customers as part of a customer identification program ("CIP"), as

required of FCMs by the Regulations.[1]

        2.        On approximately August 23, 2021, bZeroX transferred control of the bZx

Protocol to the bZx DAO, a decentralized autonomous organization ("DAO"), which

subsequently, on approximately December 18, 2021, renamed itself and is now doing business as

the Ooki DAO.  The Ooki DAO is an unincorporated association comprised of holders of

OokiDAO Tokens ("Ooki Tokens") who vote those tokens to govern (e.g., to modify, operate,

market, and take other actions with respect to) the bZx Protocol (which the Ooki DAO has

renamed the "Ooki Protocol").

---

[1]     In an Order filed concurrently with this Complaint, bZeroX and two individuals who
controlled it (the "bZx Founders") resolved charges with the Commission in connection with this
unlawful conduct.  *See In re bZeroX, LLC, Tom Bean, and Kyle Kistner*, CFTC No. 22-31 (Sept.
22, 2022).  Accordingly, this Complaint does not charge or seek relief related to conduct by
bZeroX and the bZx Founders during the bZx Relevant Period; although, such conduct is
relevant to this Complaint.

3.    A key bZeroX objective in transferring control of the bZx Protocol (now the Ooki

Protocol) to the bZx DAO (now the Ooki DAO) was to attempt to render the bZx DAO, by its

decentralized nature, enforcement-proof.  Put simply, the bZx Founders believed they had

identified a way to violate the Act and Regulations, as well as other laws, without consequence.

A bZx Founder so stated on a call with bZeroX community members prior to transferring control

of the bZx Protocol to the bZx DAO:

> It's really exciting.  We're going to be really preparing for the new regulatory
> environment by ensuring bZx is future-proof.  So many people across the industry
> right now are getting legal notices and lawmakers are trying to decide whether
> they want DeFi companies to register as virtual asset service providers or not –
> and really what we're going to do is take all the steps possible to make sure that
> when regulators ask us to comply, that we have nothing we can really do because
> we've given it all to the community.

The bZx Founders were wrong, however.  DAOs are not immune from enforcement and may not

violate the law with impunity.

4.    From approximately August 23, 2021 to the present (the "DAO Relevant

Period"), the Ooki DAO[2] has operated, marketed, and made solicitations concerning the Ooki

Protocol[3] that accepted orders for and facilitated margined and leveraged retail commodity

transactions.  The Ooki DAO exists for the exact same purpose as bZeroX before it—to run a

business, and specifically, to operate and monetize the Ooki Protocol.  The Ooki DAO has done

so through the votes of Ooki Token holders (or of BZRX Token holders, when the Ooki DAO

was doing business as the bZx DAO) who, through their votes, chose to participate in running

that business.  Just like the bZx Protocol during the bZx Relevant Period, the Ooki Protocol

during the DAO Relevant Period has permitted, and continues to permit, users to contribute

---

[2]    Herein, "Ooki DAO" refers to the "Ooki DAO, formerly doing business as the bZx DAO during the DAO Relevant Period."

[3]    Herein, "Ooki Protocol" refers to the "Ooki Protocol, formerly named and operating as the bZx Protocol during the DAO Relevant Period."

margin (collateral) to open leveraged positions whose value is determined by the price difference between two virtual currencies from the time the position is established to the time it is closed. The Ooki Protocol purports to offer users the ability to engage in these transactions in a decentralized environment—i.e., without third-party intermediaries taking custody of user assets. In so doing, the Ooki DAO—which has never registered with the Commission—is unlawfully engaging in activities that can only lawfully be performed by a registered DCM and other activities that can only lawfully be performed by a registered FCM under the Act and Regulations.  In addition, the Ooki DAO does not conduct KYC diligence on its customers (and in fact advertises the lack of KYC requirements as a positive feature of the Ooki Protocol) as part of a CIP, as required of FCMs by the Regulations.

5.      By virtue of the Ooki DAO's conduct during the DAO Relevant Period as set forth above and described further herein, the Ooki DAO has engaged, is engaging, or is about to engage in acts and practices in violation of Sections 4(a) and 4d(a)(1) of the Act, 7 U.S.C. §§ 6(a), 6d(a)(1), and Regulation 42.2, 17 C.F.R. § 42.2 (2021).

6.      Unless restrained and enjoined by this Court, the Ooki DAO will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

7.      Accordingly, the Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Defendant's unlawful acts and practices, to compel its compliance with the Act and the Regulations promulgated thereunder, and to enjoin it from engaging in any commodity-related activity.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement from Defendant, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

8.       This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c of the Act, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

9.       Venue lies properly in this Court pursuant to 7 U.S.C. § 13a-1(e) because the Ooki DAO transacted business in this District and certain transactions, acts, practices, and courses of business in violation of the Act occurred, are occurring, or are about to occur in this District, among other places.

## III.     PARTIES

### A.     The CFTC

10.      Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act and Regulations promulgated thereunder.

### B.     Defendant

11.      Defendant **Ooki DAO**, formerly doing business as the bZx DAO, is an unincorporated association comprised of holders of Ooki Tokens (or of BZRX Tokens, when the Ooki DAO was doing business as the bZx DAO) who have voted those tokens to govern (e.g., to modify, operate, market, and take other actions with respect to) the Ooki Protocol (formerly named the bZx Protocol) during the DAO Relevant Period.  The Ooki DAO has never been registered with the Commission in any capacity.

- 5 -

## IV.   STATUTORY BACKGROUND AND LEGAL FRAMEWORK

### A.   To Protect Members of the Public, Retail Commodity Transactions Must Be Offered on a Regulated Exchange.

12.    The purpose of the Act is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5.

13.    Derivatives are financial instruments such as futures, options or swaps that derive their value from something else, like a benchmark or a physical commodity.  The Act requires that, subject to certain exemptions, commodity derivative transactions must be conducted on exchanges designated by, or registered with, the CFTC.  For example, trading of commodity futures contracts must be conducted on a board of trade designated by the CFTC as a contract market or a registered foreign board of trade.  Section 4 of the Act, 7 U.S.C. § 6; Regulation 48.3, 17 C.F.R. § 48.3 (2021).

14.    Retail commodity transactions are transactions that are entered into with, or offered to, non-eligible contract participants[4] "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a

---

[4]    An eligible contract participant ("ECP") is, in general, an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10 million, or $5 million if the individual enters into the transaction "in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual."  Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi).

similar basis" and which does not result in actual delivery within 28 days.  Section 2(c)(2)(D)(i), (ii)(III)(aa) of the Act, 7 U.S.C. § 2(c)(2)(D)(i), (ii)(III)(aa).  Retail commodity transactions are subject to 7 U.S.C. § 6(a) "as if" they are a contract of sale of a commodity for future delivery and therefore must be executed on a regulated exchange.  7 U.S.C. § 2(c)(2)(D)(iii).

15.   A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights.  Digital assets include virtual currencies, such as bitcoin or ether, which are digital representations of value that function as mediums of exchange, units of account, and/or stores of value.  Certain digital assets, including those alleged herein, are "commodities" as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).  Accordingly, transactions in digital assets that are otherwise retail commodity transactions under 7 U.S.C. § 2(c)(2)(D) must be executed on a regulated exchange.  7 U.S.C. § 2(c)(2)(D)(iii).

16.   The requirement to execute retail commodity transactions on a regulated exchange is necessary to ensure vital protections for U.S. derivatives markets and market participants.  For example, DCMs: (a) must conform to core principles that are designed to prevent market abuse, Section 5(d)(12)(a) of the Act, 7 U.S.C. § 7(d)(12)(a); (b) ensure their financial stability, 7 U.S.C. § 7(d)(21); (c) ensure that the contracts they list for trading are "not readily susceptible to manipulation," 7 U.S.C. § 7(d)(3); (d) "prevent market disruption," 7 U.S.C. § 7(d)(4); (e) protect their information security, Regulation 38.1051(a)(2), 17 C.F.R. § 38.1051(a)(2) (2021); (f) safeguard their systems in the event of a disaster, 17 C.F.R. §§ 38.1051(a)(3) (2021); (g) impose position limits designed to reduce the potential threat of market manipulation or congestion, 7 U.S.C. § 7(d)(5); (h) establish and enforce rules to minimize conflicts of interest, 7 U.S.C. § 7(d)(16); and (i) maintain and retain important records and provide them to the Commission, 7 U.S.C. §§ 7(d)(18).

17.     When entities offer retail commodity transactions (and other transactions that are required to be executed on a regulated exchange) outside of a regulated exchange, and without adherence to the core principles with which regulated exchanges must comply, they place members of the public at significant risk of harm.

**B.     To Protect Members of the Public, Only Registered FCMs May Solicit or Accept Orders for, and Accept Funds to Margin, Retail Commodity Transactions.**

18.     An FCM is an individual, association, partnership, corporation, or trust that is: (i) engaged in soliciting or in accepting orders for regulated transactions including futures, swaps, commodity options, or retail commodity transactions, or (ii) acts as a counterparty to retail commodity transactions; and which, in connection with these activities, "accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom."  Section la(28)(A) of the Act, 7 U.S.C. § la(28)(A).

19.     FCMs hold customer funds to margin commodity derivative transactions.  They are a critical component of the U.S. financial system, and therefore must meet stringent requirements imposed by the Act and Regulations.  Among the most fundamental of these requirements is Section 4d(a) of the Act, 7 U.S.C. § 6d(a), which makes it illegal for any person to act as an FCM unless registered as such with the Commission.

20.     Like the requirement to conduct retail commodity transactions on a regulated exchange, the requirement that only registered FCMs may solicit or accept orders for, and accept funds to margin, retail commodity transactions is necessary to ensure vital protections for United States derivatives markets and market participants.  For example, FCMs must segregate customer assets to protect them from the risk of the FCM's insolvency, 7 U.S.C. § 6d(a)(2); establish safeguards to prevent conflicts of interest, 7 U.S.C. § 6d(c); and employ only salespeople who

register with the CFTC and meet strict proficiency requirements, Section 4k(1) of the Act, 7 U.S.C. § 6k(1).

21.     When entities solicit and accept orders for and accept funds to margin retail commodity transactions without registering as an FCM and without adhering to the customer-protection requirements with which FCMs must comply, they place members of the public at significant risk of harm.

**C.     To Prevent Money Laundering and Transactions by Prohibited Persons, FCMs Must Adopt CIPs to Verify the Identifies of their Customers.**

22.     Regulation 42.2, 17 C.F.R. § 42.2 (2021), requires, among other things, that every FCM shall comply with the applicable provisions of the Bank Secrecy Act ("BSA") and the regulations promulgated by the Department of the Treasury under that Act at 31 C.F.R. chapter X (2021), and with the requirements of 31 U.S.C. § 5318(l) and the implementing regulation jointly promulgated by the Commission and the Department of the Treasury at 31 C.F.R. § 1026.220 (2021), which require that a CIP be adopted as part of the firm's BSA compliance program.

23.     31 U.S.C. § 5318(l) requires, among other things, that financial institutions such as FCMs implement reasonable procedures to verify the identity of any person seeking to open an account, maintain records of information used to verify a person's identity, and consult lists of known or suspected terrorists or terrorist organizations (such as those created and distributed by the Office of Foreign Asset Control of the United States Department of Treasury ("OFAC")) to determine whether a person seeking to open an account appears on any such list.

24.     The regulations promulgated by the Department of Treasury under 31 C.F.R. chapter X require, as relevant here, that every FCM must:  (1) implement a written CIP that, at a minimum, includes procedures for verifying the identity of each customer sufficient to enable the

FCM to form a reasonable belief that it knows the true identity of each customer; (2) retain

records collected pursuant to the CIP; and (3) implement procedures for determining whether a

customer appears on any list of known or suspected terrorists or terrorist organizations.

## V.  FACTS

### A.  During the bZx Relevant Period, bZeroX and the bZx Founders Designed, Deployed, Operated, Marketed, and Controlled the bZx Protocol.

25.     A blockchain is a distributed, shared, immutable ledger that facilitates the process

of recording transactions and tracking digital assets in a consensus-based network.  A "smart

contract" is a self-enforcing piece of computer code containing all terms of a contract—meaning

the software can execute the agreement contained in the contract without additional input from

the parties.

26.     During the bZx Relevant Period, the bZx Protocol was a collection of smart

contracts on the Ethereum blockchain that purported to facilitate transactions without

intermediaries.

27.     As set forth above, digital assets include virtual currencies.  Ether ("ETH") is the

Ethereum blockchain's native virtual currency.  In addition, Ethereum's ERC-20 token standard

permits the conversion of non-ETH virtual currencies into tokens that can be traded on

Ethereum.  For example, DAI is an ERC-20 token that can be transacted with on the Ethereum

blockchain and whose value is pegged one-to-one to the price of the U.S. dollar.

28.     The bZx Protocol enabled any person with an Ethereum wallet to contribute

margin (collateral) to open leveraged positions whose ultimate value was determined by the price

difference between two digital assets from the time the position was established to the time it

was closed.  For example, if a trader believed that the price of ETH would rise relative to the

price of DAI, the trader might open, for example, a 5x long position in ETH versus DAI (i.e., a

position worth five times the increase in the price of ETH relative to DAI from the time the

position was established and the time it was closed).  To do so, the trader would proceed as

follows:

    a.   The trader would post collateral (e.g., ETH) to a bZx Protocol smart contract as margin to open the leveraged position.  (Notably, positions on the bZx Protocol were required to be overcollateralized—i.e., the value of the collateral was required to exceed the value of the borrowed asset.  This was to ensure repayment of the borrowed asset.  Prior to a trader closing an open position, if the position had lost too much value, the bZx Protocol was designed to facilitate the automatic liquidation of the position and retention and sale of the posted collateral to cover the loss.)

    b.   The smart contract would borrow DAI from a bZx Protocol liquidity pool, whose assets were supplied by liquidity providers who, in exchange, had received interest-generating tokens as well as BZRX Protocol Tokens ("BZRX Tokens") conferring voting rights on certain matters relevant to bZx Protocol governance.  (The BZRX Tokens conferred voting rights in proportion to the holder's percentage of total BZRX Tokens issued.  Additional BZRX Tokens were otherwise minted and allocated to certain individuals.)

    c.   The smart contract would exchange the borrowed DAI for ETH on a separate, on-chain decentralized exchange.

    d.   The smart contract would lock (i.e., prevent from being withdrawn absent conditions expressly written into the smart contract) the newly received ETH and create a token representing the newly established 5x long position.

    e.   The smart contract would send that token to the trader.

29.     If the trader was correct (i.e., that the price of ETH would rise relative to the price of DAI), the trader could redeem the token reflecting the position for a profit (i.e., the smart contract would transfer the resulting profit to the trader).  If the trader was incorrect (i.e., the price of ETH did not rise relative to the price of DAI), the trader could still redeem the token, except instead of paying profits, the smart contract would retain however much of the collateral was needed to cover the loss.

30.     If the trader wished to open a short position, the trading mechanics would be similar, except the trader would borrow ETH and swap it into DAI.  Traders could open similar positions involving various additional virtual currencies.

31.     The transactions on the bZx Protocol did not involve contracts of sale of digital assets; rather, they involved leveraged positions whose value was determined by the price difference between two digital assets.  Positions on the bZx Protocol automatically rolled over every 28 days (and could thus exist perpetually) and could be liquidated at any time.

32.     bZeroX, through the bZx Founders, among others, developed a website to market, solicit orders for, and facilitate access to the bZx Protocol.  For example, bZeroX's website claimed that it offered a superior margin trading experience because "[t]here is no need for any verification, KYC or AML."  The website further claimed that bZeroX purportedly did not take custody of users' assets, and there were minimal liquidation penalties.  The bZx Founders also made public statements, appeared in interviews, wrote articles, led calls with community members that are publicly available on YouTube, and otherwise publicly marketed and solicited members of the public to utilize the bZx Protocol.  The bZeroX website enabled users, through the click of a few buttons, to transfer assets and open positions on the bZx Protocol using the mechanics described above.

33.     bZeroX collected fees from users, including origination fees, trading fees, and a percentage of interest paid to lenders.  bZeroX purports to have collected approximately $50,000 in fees prior to June 2020 and, between June 2020 and August 2021, approximately $500,000 in fees).[5]

34.     Prior to August 23, 2021 (at which time bZeroX transferred control of the bZx Protocol to the bZx DAO), bZeroX retained "administrator keys" ("Keys") permitting bZeroX to access and control the operation of, and the funds held in, the smart contracts involved in the above processes.  The Keys enabled bZeroX to, for example, update relevant smart contract code to adjust how the smart contracts operated; pause or suspend trading; pause or suspend contributions or withdrawals of assets and redemptions of tokens to close positions; and otherwise direct disposition of the funds held in the bZx Protocol smart contracts.

35.     During the bZx Relevant Period, bZeroX did not maintain a CIP and explicitly advertised the lack of KYC or AML compliance as a positive feature of the bZx Protocol. bZeroX offered any user anywhere in the world (including in the United States) the ability to trade on the bZx Protocol and, specifically, did not take any steps to exclude U.S. persons and/or non-ECPs from the bZx Protocol.

36.     At least twice during the bZx Relevant Period, third parties engaged in manipulative conduct on the bZx Protocol that resulted in the loss of customer funds.  This is precisely the sort of conduct that compliance with the Commission's rules and regulations described above—and adherence to core-principles and regulations such as offering transactions

---

[5]     Fees are held in BZRX Tokens or 3CRV (a stablecoin that is redeemable for DAI, USDT, or USDC on Curve.Finance).  The listed figures reflect approximate conversions to U.S. Dollars as of approximately September 14, 2021.

on a platform not readily susceptible to manipulation and segregating customer funds to minimize risk of loss—is designed to prevent and/or mitigate.

37.     Specifically, on approximately February 14 and 17, 2020, one or more anonymous users entered into transactions on the bZx Protocol and other platforms that resulted in user(s) allegedly:  (1) intentionally defaulting on a bZx Protocol loan which the user had allegedly deliberately undercollateralized by borrowing assets at a price the user had, allegedly, intentionally artificially deflated through arbitrage trades across various platforms; and (2) manipulating pricing "oracles" (i.e., third-party pricing sources on which the bZx Protocol relied) to improperly profit on transactions on the bZx Protocol.  Because bZeroX did not conduct KYC on its customers, bZeroX could not identify the individual(s) who engaged in this conduct.  Relevant here, in each case, bZeroX utilized its Keys to pause trading and withdrawals, and to implement fixes to the smart contract code, to address the existing or potential losses to the bZx Protocol.

**B.** **During the DAO Relevant Period, the bZx DAO (Eventually Renamed the Ooki DAO During the DAO Relevant Period) Controlled and Operated the bZx Protocol (Eventually Renamed the Ooki Protocol During the DAO Relevant Period).**

38.     On approximately August 23, 2021, bZeroX transferred control of the bZx Protocol (including relevant Keys) to the bZx DAO.  From that point forward, the bZx DAO could act with respect to the bZx Protocol only through a vote of BZRX Token holders.

39.     The bZx DAO was an unincorporated association comprised of BZRX Token holders who voted those tokens to govern the bZx Protocol.

40.     As set forth in Paragraph 3, the bZx Founders believed that transitioning to a DAO would insulate the bZx Protocol from regulatory oversight and accountability for compliance with U.S. law.

41.   In practice, however, the bZx DAO controlled and operated the bZx Protocol just as bZeroX before it had done.  Specifically:

a.   The bZx Protocol continued to enable any person with a compatible digital asset wallet to contribute margin (collateral) to open leveraged positions whose value was determined by the price difference between two digital assets from the time the position was established to the time it was closed, utilizing the mechanics described in Paragraphs 28-31;

b.   The bZx DAO continued to market, solicit orders for, and facilitate access to the bZx Protocol, including through individuals acting on the bZx DAO's behalf (such as the bZx Founders) and the front-end website the bZx DAO now controlled, as described in Paragraph 32;

c.   The bZx DAO continued to collect the same kinds of fees, including origination fees, trading fees, and a percentage of interest paid to lenders, that bZeroX had collected, as described in Paragraph 33;

d.   The bZx DAO now controlled the Keys, which enabled the bZx DAO to access and control the operation of, and the funds held in, the relevant bZx Protocol smart contracts, as described in Paragraph 34; and

e.   The bZx DAO, through its front-end website, continued to advertise the lack of KYC and AML requirements as a positive feature of the bZx Protocol; offer any user anywhere in the world (including in the United States) the ability to trade on the bZx Protocol; and not take any steps to exclude U.S. persons and/or non-ECPs from the bZx Protocol, just like bZeroX before it, as described in Paragraph 35.

42.   Just as bZeroX (like any LLC) governed the bZx Protocol through the votes of its members (i.e., the bZx Founders), the bZx DAO governed the bZx Protocol through the votes of

BZRX Token holders.  Specifically, any BZRX Token holder had the right to propose, and to vote his or her BZRX Tokens to effect, changes to the bZx Protocol or otherwise shape the direction of the bZx DAO's business.

43.     The general process for BZRX Token holders to govern the bZx DAO was that any new proposals were first discussed on the bZx Community Forum ("bZx Forum").  Proposals that were not widely supported typically ended there.  If there was sufficient support, a non-binding "snapshot vote" could be conducted to gauge support for a particular proposal.  If a proponent believed there was sufficient support, a binding vote could be held directly on the bZx Protocol through a fork of the Compound Bravo Governance Module smart contract that enabled BZRX Token holders to vote those tokens for or against a proposal.  Approved proposals were implemented by individuals as authorized by the bZx DAO.

44.     For example, on approximately August 24, 2021, the bZx Founders proposed in the bZx Forum that the bZx DAO approve an omnibus funding plan for going-forward bZx DAO operations—including release of funds for marketing, operations, development, community management, and legal expenses.  The proposal passed a snapshot vote unanimously, and BZRX Token holders voted to approve the proposal in September 2021.  Funds were subsequently released from the bZx DAO Treasury (which contained bZx Protocol revenue) to pay the approved expenses.

45.     Similarly, in approximately December 2021, the bZx DAO voted to utilize funds from the bZx DAO Treasury to compensate certain bZx DAO members and other users of the bZx Protocol who lost funds in connection with an alleged November 2021 security breach and theft of funds on the bZx Protocol.  (The November 2021 incident involved a spearfishing attack against a bZx DAO developer through whom the perpetrator allegedly gained access to, and stole, bZx Protocol assets as well as the developer's personal assets.  Like the February 2020

incidents described above, this illustrates why retail commodity transactions may only lawfully be offered on regulated exchanges, and why only registered FCMs may accept customer funds to margin such transactions—the core principles and rules applicable to registered entities are designed to prevent and/or mitigate the risk of such incidents occurring and customer harm in the event they do occur.)

46.     On approximately December 18, 2021, through a vote of BZRX Token holders, the bZx DAO renamed itself the Ooki DAO.  This was simply a rebranding in name only (and was repeatedly described by members of the bZx DAO as merely a "rebrand") and did not result in legal changes to the DAO's business or material changes to its operations.  The Ooki DAO now operates the bZx Protocol (which the Ooki DAO has renamed the Ooki Protocol) in the exact same manner that the bZx DAO operated the bZx Protocol, for example as described in Paragraph 41.

47.     The Ooki DAO is an unincorporated association comprised of Ooki Token holders who have voted those tokens to govern the Ooki Protocol.

48.     The Ooki DAO website describes specific Ooki DAO procedures for proposing and voting on Ooki DAO governance proposals, which are consistent with the procedures utilized when the Ooki DAO was doing business as the bZx DAO, as summarized in Paragraphs 42-43.  In short, the Ooki DAO is governed by the vote of holders of Ooki Tokens, which are issued in the same manner that BZRX Tokens were issued by the bZx DAO.  Holders of BZRX Tokens have the ability to convert those tokens into Ooki Tokens.

49.     During the DAO Relevant Period, multiple Ooki DAO members have resided in the United States and have conducted Ooki DAO business (for example, voting Ooki Tokens to govern the Ooki DAO and operate the Ooki Protocol) from within the United States.

50.     During the DAO Relevant Period, the Ooki Protocol has been deployed, and is made available by the Ooki DAO, on multiple blockchains, including the Polygon and Binance Smart Chain blockchains in addition to the Ethereum blockchain.

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT I

### Violations of Section 4(a) of the Act, 7 U.S.C. § 6(a)

### Engaging in Unlawful Off-Exchange Leveraged and Margined Retail Commodity Transactions

51.     The allegations set forth in paragraphs 1 through 50 are re-alleged and incorporated herein by reference.

52.     Virtual currencies such as ETH, DAI, and others traded on the Ooki Protocol are "commodities" under the Act.

53.     Retail commodity transactions are transactions that are entered into with, or offered to, non-eligible contract participants "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis" and which does not result in actual delivery within 28 days.  Section 2(c)(2)(D)(i), (ii)(III)(aa) of the Act, 7 U.S.C. § 2(c)(2)(D)(i), (ii)(III)(aa).

54.     Retail commodity transactions are subject to 7 U.S.C. § 6(a) "as if" they are a contract of sale of a commodity for future delivery and therefore must be executed on a regulated exchange.  Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii).

55.     7 U.S.C. § 6(a) makes it unlawful for any person to offer to enter into, enter into, execute, confirm the execution of, or conduct an office or business in the United States for the purpose of soliciting, or accepting any order for, or otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery, unless

- 18 -

such transaction is made on or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market for the specific commodity (i.e., a DCM).

56.     During the DAO Relevant Period, Defendant Ooki DAO, by and through its members (i.e., the Ooki Token holders who voted their Ooki Tokens to govern the Ooki DAO and operate the Ooki Protocol), officers, employees, and/or agents, violated and is continuing to violate 7 U.S.C. § 6(a) by:

         a.     offering to enter into retail commodity transactions;

         b.     entering into retail commodity transactions;

         c.     executing retail commodity transactions;

         d.     confirming the execution of retail commodity transactions; and/or

         e.     conducting an office or business in the United States for the purpose of soliciting and/or accepting any order for, and/or otherwise dealing in, any transaction in, or in connection with, retail commodity transactions;

without conducting such transactions on or subject to the rules of a board of trade that was designated or registered by the CFTC as a contract market.

57.     The Ooki DAO's retail commodity transactions are and were offered, entered into or executed on a leveraged or margined basis.

58.     The Ooki DAO's retail commodity transactions are and were offered to, entered into or executed with persons who are not eligible contract participants or eligible commercial entities and who are not engaged in a line of business related to virtual currencies.

59.     Each offer to enter into, entry into, execution of, confirmation of the execution of, and/or act of conducting an office or business in the United States relating to retail commodity transactions, including, without limitation, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6(a).

60.     The acts, omissions, and failures of the members of the Ooki DAO unincorporated association (i.e., the Ooki Token holders who voted their Ooki Tokens to govern the Ooki DAO by, for example, directing the operation of the Ooki Protocol), as well as of those authorized to work on behalf of the Ooki DAO, were done within the scope of their office, employment, or agency with the Ooki DAO.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021), the Ooki DAO is liable as a principal for each act, omission, or failure of the members, officers, employees, or agents acting for the Ooki DAO.

## COUNT II

### Violation of Section 4d of the Act, 7 U.S.C. § 6d

### Engaging in Activities That Can Only Lawfully Be Performed by a Registered Futures Commission Merchant

61.     Paragraphs 1 through 50 of this Complaint are re-alleged and incorporated herein by reference.

62.     Section 1a(28) of the Act, 7 U.S.C. § 1a(28), in relevant part, defines an FCM as any individual, association, partnership, corporation or trust that engages in soliciting or in accepting orders for "any agreement, contract, or transaction described in… section (2)(c)(2)(D)(i)" and, in connection therewith, "accepts any money… or property (or extends credit in lieu thereof) to margin . . . trades or contracts that result or may result therefrom."

63.     Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1), in pertinent part, makes it unlawful for any person to act as an FCM unless registered with the Commission as an FCM.

64.     During the DAO Relevant Period, Defendant Ooki DAO, by and through its members, officers, employees, and/or agents, has operated as an FCM, and is continuing to operate as an FCM, by:

a.      engaging in soliciting or accepting orders for agreements, contracts or

transactions described in section 2(c)(2)(D)(i) of the Act (retail

commodity transactions); and

b.      in or in connection with such activities, accepting money, securities, or

property (or extending credit in lieu thereof) to margin, guarantee, or

secure resulting trades on the Ooki Protocol platform.

65.     During the Relevant Period, Defendant Ooki DAO, by and through its members,

officers, employees, and/or agents, violated and is continuing to violate 7 U.S.C. § 6d by failing

to register with the Commission as an FCM.

66.     Each act in violation of 7 U.S.C. § 6d, including, but not limited to, those

specifically alleged herein, is alleged as a separate and distinct violation.

67.     The acts, omissions, and failures of the members of the Ooki DAO

unincorporated association (i.e., the Ooki Token holders who voted their Ooki Tokens to govern

the Ooki DAO by, for example, directing the operation of the Ooki Protocol), as well as of those

authorized to work on behalf of the Ooki DAO, were done within the scope of their office,

employment, or agency with the Ooki DAO.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and

17 C.F.R. § 1.2, the Ooki DAO is liable as a principal for each act, omission, or failure of the

members, officers, employees, or agents acting for the Ooki DAO.

### COUNT III

### Violations of Regulation 42.2, 17 C.F.R. § 42.2 (2021)

### Failure to Implement Customer Information Program and Failure to Implement Know Your Customer and Anti-Money Laundering Procedures

68.     Paragraphs 1 through 50 of this Complaint are re-alleged and incorporated herein

by reference.

69.     17 C.F.R. § 42.2 provides that every FCM "shall comply with the applicable provisions of the Bank Secrecy Act and the regulations promulgated by the Department of the Treasury under that Act at 31 CFR chapter X (2021), and with the requirements of 31 U.S.C. 5318(l) and the implementing regulation jointly promulgated by the Commission and the Department of the Treasury at 31 CFR 1026.220 (2021), which require that a customer identification program be adopted as part of the firm's Bank Secrecy Act compliance program."

70.     During the Relevant Period, Defendant Ooki DAO, by and through its members, officers, employees, and/or agents, violated and is continuing to violate 17 C.F.R. § 42.2 by failing to implement a Customer Information Program, failing to implement Know-Your-Customer policies and procedures, failing to implement an Anti-Money Laundering program, failing to retain required customer information, and failing to implement procedures to determine whether a customer appears on lists of known or suspected terrorists or terrorist organizations such as those issued by OFAC.

71.     Each act in violation of 17 C.F.R. § 42.2, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

72.     The acts, omissions, and failures of the members of the Ooki DAO unincorporated association (i.e., the Ooki Token holders who voted their Ooki Tokens to govern the Ooki DAO by, for example, directing the operation of the Ooki Protocol), as well as of those authorized to work on behalf of the Ooki DAO, were done within the scope of their office, employment, or agency with the Ooki DAO.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, the Ooki DAO is liable as a principal for each act, omission, or failure of the members, officers, employees, or agents acting for the Ooki DAO.

## VII.   RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section

6c of the Act, 7 U.S.C. § 13a-l, and pursuant to the Court's own equitable powers, enter:

A.     An order finding that Defendant Ooki DAO, by and through its members, officers, employees, and agents, violated Section 4(a) of the Act, 7 U.S.C. § 6(a); Section 4d of the Act, 7 U.S.C. § 6d; and Regulation 42.2, 17 C.F.R. § 42.2 (2021).

B.     An order of permanent injunction prohibiting Defendant Ooki DAO, including all members of the Ooki DAO (i.e., the Ooki Token holders who voted their Ooki Tokens to govern the Ooki DAO by, for example, directing the operation of the Ooki Protocol), and any other person or entity associated with it, from engaging in conduct described above, in violation of 7 U.S.C. §§ 6(a), 6d, and 17 C.F.R. § 42.2.

C.     An order of permanent injunction prohibiting Defendant Ooki DAO and any of its affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert or participation with Defendant, from directly or indirectly:

(i)     trading on or subject to the rules of any registered entity (as that term is defined in Section la of the Act, 7 U.S.C. § la(40));

(ii)    entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for Defendant's own accounts or for any account in which they have a direct or indirect interest;

(iii)   having any commodity interests traded on Defendant's behalf;

(iv)    controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(v)     soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

(vi)     applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021);

(vii)    acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

D.     An order directing Defendant Ooki DAO and any third-party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, loans, or fees derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulation 42.2 as described herein, including pre-judgment and post-judgment interest;

E.     An order directing Defendant Ooki DAO and any successors thereof to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with, or among Defendants and any customer or investor whose funds were received by Defendants as a result of the acts and practices that constituted violations of the Act and Regulation 42.2, as described herein;

F.     An order requiring Defendant Ooki DAO to make full restitution by making whole each and every customer or investor whose funds were received or utilized by them in violation of the provisions of the Act and Regulation 42.2 as described herein, including pre-judgment interest;

G.     An order directing Defendant Ooki DAO to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of

the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties

Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), title

VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation

of the Act and Regulation 42.2, as described herein;

     H.    An order requiring Defendant Ooki DAO to pay costs and fees as permitted by

28 U.S.C. §§ 1920 and 2412(a)(2); and

     I.    Such other and further relief as the Court deems proper.


Dated:  September 22, 2022         Respectfully submitted,

         **COMMODITY FUTURES TRADING COMMISSION**


         By:  /s/ Anthony C. Biagioli
         Tom Simek (DC Bar # 57268), tsimek@cftc.gov
         TRIAL COUNSEL
         Anthony C. Biagioli (MO Bar # 72434), abiagioli@cftc.gov
         Attorneys for Plaintiff
         COMMODITY FUTURES TRADING COMMISSION
         2600 Grand Boulevard, Suite 210
         Kansas City, MO  64108
         (816) 960-7700