Laura Kabler Oswell (SBN 241281)
1870 Embarcadero Road
Palo Alto, CA 94303
Tel.: (650) 461-5600
Fax: (650) 461-5700
oswelll@sullcrom.com

Ann-Elizabeth Ostrager (*pro hac vice*)
James M. McDonald (*pro hac vice*)
125 Broad Street
New York, NY 10014
Tel.: (212) 558-4000
Fax: (212) 558-3588
ostragerae@sullcrom.com
mcdonaldj@sullcrom.com

Daniel J. Richardson (*pro hac vice*)
1700 New York Ave. NW
Washington, DC 20006
Tel.: (202) 956-7500
Fax: (202) 293-6330
richardsond@sullcrom.com

Attorneys for *Amicus Curiae* DeFi Education Fund

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *Commodity Futures Trading Commission*,<br><br>                            Plaintiff,<br><br>         vs.<br><br>*Ooki DAO (formerly d/b/a bZx DAO), an unincorporated association*,<br><br>                            Defendant. | Case No. 3:22-cv-5416-WHO<br><br>**Reply Brief of *Amicus Curiae* DeFi Education Fund Regarding Plaintiff's Motion for Alternative Service**<br><br>Noticed Hearing Date and Time:<br><br>Wednesday, December 7, 2022 at 2:00 p.m.<br><br>Hon. William H. Orrick |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION..........................................................................................................................1

ARGUMENT ..............................................................................................................................2

I.      THE COMMISSION'S PROPOSED METHOD OF SERVICE IS
        UNLAWFUL .................................................................................................................2

        A.      The Commission's Alternative Method of Service Was Not Reasonably
                Calculated to Provide Actual Notice of This Suit.................................................. 2

                1.      The Commission must demonstrate that its method of service was
                        likely to provide actual notice to the voting token holders identified
                        in the Complaint..........................................................................................3

                2.      The Commission has not shown that service through a Help Chat
                        Box or Online Forum would provide actual notice to voting token
                        holders...........................................................................................................4

        B.      Ooki DAO is Not an Unincorporated Association. .................................................. 5

                1.      The Court Can and Should Reject the Commission's
                        Unincorporated Association Theory Now. ...................................................5

                2.      As Alleged in the Complaint, Ooki DAO is Not an Unincorporated
                        Association.....................................................................................................7

        C.      The Commission Has Not Demonstrated That Service Took Place in the
                United States. ....................................................................................................... 10

II.     THE COMMISSION'S UNPRECEDENTED THEORY IS HARMFUL AND
        UNNECESSARY ........................................................................................................11

        A.      The Commission's Approach Would Allow it to Evade Important Limits
                on Accomplice Liability. ..................................................................................... 11

        B.      The Commission's Approach Harms Token Holders and Inhibits
                Innovation. .......................................................................................................... 13

        C.      The Commission's Approach is Unnecessary to Enforce the CEA...................... 14

CONCLUSION ..........................................................................................................................15

SULLIVAN & CROMWELL LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asiacell Comms. PJSC* v. *Doe I*,
2018 WL 3496105 (N.D. Cal. July 20, 2018)............................................................................4

*Associated Press* v. *Mont. Senate Republican Caucus*,
951 P.2d 65 (Mont. 1997)...........................................................................................................8

*BMA LLC* v. *HDR Global Trading Ltd.*,
2021 WL 949371 (N.D. Cal. 2021) ..........................................................................................11

*Boyle* v. *United States*,
556 U.S. 938 (2009)...................................................................................................................12

*Brown* v. *Fifth Judicial Dist. Drug Task Force*,
255 F.3d 475 (8th Cir. 2001) ......................................................................................................9

*In re bZeroX, LLC, et al.*,
CFTC No. 22-31, 2022 WL 4597664 (Sept. 22, 2022) ............................................................14

*Cent. Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)...................................................................................................................12

*Ellard* v. *Conway*,
114 Cal. Rptr. 2d 399 (Cal. Ct. App. 2001) ...............................................................................4

*Freedom Watch, Inc.* v. *Org. of Petroleum Exporting Countries*,
107 F.Supp.3d 134 (D.D.C. 2015) ............................................................................................11

*LawRank LLC* v. *LawRankSEO.com*,
2021 WL 4461592 (N.D. Cal. Sept. 29, 2021) ...........................................................................4

*Michael Kors, LLC* v. *Individuals, P'ships and Unincorporated Assocs.*,
2020 WL 8231117 (S.D. Fla. Dec. 4, 2020) ...............................................................................7

*NCAA* v. *Jones*,
1 S.W.3d 83 (Tex. 1999).............................................................................................................8

*Neumont Univ. LLC* v. *Nickles*,
304 F.R.D. 594, 600 (D. Nev. 2015)..........................................................................................11

*Niantic, Inc.* v. *Global++*,
2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ...........................................................................8

*Perez* v. *Foulk*,
2016 WL 1107900 (E.D. Cal. Mar. 22, 2016) ...........................................................................12

-ii-

SULLIVAN & CROMWELL LLP

*Rio Properties, Inc.* v. *Rio Int'l Interlink*,
   284 F.3d 1007 (9th Cir. 2002) ..................................................................................6

*Rockefeller Tech. Inv. (Asia) VII* v. *Changzou SinoType Tech. Co.*,
   460 P.3d 764 (Cal. 2020) .........................................................................................6

*Satanic Temple, Inc.* v. *City of Scottsdale*,
   423 F. Supp. 3d 766 (D. Ariz. 2019) .......................................................................9

*Seattle Affiliate of Coal. to Stop Police Brutality* v. *Seattle*,
   2005 WL 3418415 (W.D. Wash. Dec. 12, 2005) .....................................................8

*Schnell* v. *Nat'l Flood Insurer's Ass'n*,
   520 F. Supp. 150 (D. Colo. 1981)............................................................................6

*SEC* v. *Peretz*,
   317 F. Supp. 2d 58 (D. Mass. 2004) ......................................................................11

*United States* v. *Stevens*,
   559 U.S. 460 (2010)...............................................................................................13

*Whitman* v. *American Trucking Assocs.*,
   531 U.S. 457 (2001)...............................................................................................13

**Statutes**

Del. Code tit. 6, § 18-704(a) ..........................................................................................10

15 U.S.C.

   § 77b..........................................................................................................................14

   § 77o(b)......................................................................................................................12

   § 78c..........................................................................................................................11

   § 80a-47(b).................................................................................................................12

18 U.S.C. § 1961(4) .......................................................................................................12

33 U.S.C. § 1321 ...........................................................................................................12

42 U.S.C.

   § 1985........................................................................................................................12

   § 9601(21)..................................................................................................................11

**Rules**

Fed. R. Civ. P.

-iii-

1  4 ...............................................................................................................2, 10

2  4(h)(1) .....................................................................................................10, 11

3  4(h)(2) .....................................................................................................10, 11

4  **Other Authorities**

5  Jason Gottlieb, Daniel Isaacs & Alexandra Wang, *How to do Business as a DAO*,
6    CoinDesk (Oct. 20, 2021), https://www.coindesk.com/policy/2021/10/20/how-to-do-
     business-as-a-dao/. .........................................................................................10

7  Yonca Braeckman, *Philanthropy DAOs—The Future of Giving*, Medium (Feb. 17, 2022),
8    https://medium.com/impact-shakers/philanthropy-daos-the-future-of-giving....................................14

9  Zach Smith & David Swegle, *The Legal Status of Decentralized Autonomous*
     *Organizations: Do DAOs Require New Business Structures?  Some States Think So.*,
10   Heritage Found. (Jan. 1, 2022), https://www.heritage.org/government-
     regulation/commentary/the-legal-status-decentralized-autonomous-organizations-do-
11   daos ..........................................................................................................10

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SULLIVAN & CROMWELL LLP

**INTRODUCTION**

1    The Commission's purported theory of the case set forth in the Opposition cannot coexist with its

2  allegations in the Complaint and the relief it seeks.  The Commission's Opposition argues, on the one

3  hand, that because it is pursuing an action against an unincorporated association rather than individuals,

4  its form of alternative service is appropriate as it reached the broader "community" (Opp. 8) interested in

5  the Ooki Protocol.  On the other hand, the Commission's Complaint asserts that the Ooki DAO is an

6  unincorporated association consisting *only* of precisely defined individuals—token holders who took

7  particular votes "to modify, operate, market, and take other actions with respect to" the Ooki Protocol

8  (Compl. ¶ 2.)—who will be jointly and severally liable for any judgment against the unincorporated

9  association.  (Opp. 13.)  The Commission cannot have it both ways.  To lawfully effect service consistent

10  with the Complaint's theory, the Commission must demonstrate both (i) that its method of service is

11  reasonably calculated to reach those specific voting token holders and (ii) that Ooki DAO is actually an

12  unincorporated association that can accept service.

13    The Commission fails on both fronts.  In defending its proposed method of service, the

14  Commission notes that it posted notice of its Complaint to an Online Forum and a Help Chat Box.  But

15  the Commission has not shown that the voting token holders identified in the Complaint control (or even

16  viewed) the Online Forum or the Help Chat Box.  Therefore, either the Commission has failed to serve its

17  complaint in a manner consistent with the Complaint's alleged defendant, or it has recast its theory of the

18  defendant in a manner that would stretch the concept of an unincorporated association beyond recognition.

19    Further, the Commission claims in its Opposition that its proposed method of service complied

20  with Federal Rule of Civil Procedure 4(h)(1), which requires that service take place "in a judicial district

21  of the United States."  (Opp. 10.)  But on the facts as alleged, the Commission has not shown that service

22  on Ooki DAO took place in this district—or any other.

23    The stakes of the Commission's novel theories are significant.  The Commission asserts that

24  individual voting Ooki token holders will be jointly and severally liable for any judgment against Ooki

25  DAO.  (Opp. 13.)  But the Commission has not actually taken steps reasonably calculated to notify those

26  specific individuals of its lawsuit.  Nor has it articulated a theory of liability in which those individuals

27  had *any* knowledge of unlawful activity or took *any* steps to further a violation of the law—the two

DEFI EDUCATION FUND *AMICUS CURIAE* BRIEF
CASE NO. 3:22-cv-5416-WHO

hallmarks of aiding and abetting liability.  If the Commission's theory is successful here, federal regulators (and possibly private litigants) will be empowered to rely on a greatly expanded definition of unincorporated associations to avoid the ordinary burdens of serving those alleged accomplices, much less proving accomplice liability.  The Commission's broad view of voting token holder liability would also chill innovation and create considerable uncertainty for law-abiding users of emerging online technology.

The Commission asks this Court to make new law because of an unfounded concern that private parties will be able to evade service otherwise.  (Opp. 22–23.)  But nothing prevents the Commission from relying on longstanding enforcement tools to vigorously enforce the law—as evidenced by the fact that the Commission has not only identified but also sought and obtained relief against specific individuals who violated the Commodity Exchange Act ("CEA") in this very case.  And the Commission cannot ignore well-settled procedural guardrails simply because this case involves an emerging technology.  The Constitution's due process guarantee is not relaxed whenever novel facts are at stake.

The Commission's Motion for Alternative Service should be denied.

# ARGUMENT

## I.    THE COMMISSION'S PROPOSED METHOD OF SERVICE IS UNLAWFUL

The Commission's proposed method of service should be denied for three reasons.  *First*, it is not "reasonably calculated" to notify the voting token holders identified in the Complaint of this suit. *Second*, it relies on the mistaken premise that Ooki DAO is an unincorporated association consisting of those voting token holders.  *Third*, the Commission has not established that its proposed method of service has occurred "in a judicial district of the United States," and therefore has not complied with Federal Rule of Civil Procedure 4.

### A.    The Commission's Alternative Method of Service Was Not Reasonably Calculated to Provide Actual Notice of This Suit.

The Commission asserts that its proposed method of service—posting the Complaint on a Help Chat Box and Online Forum—was "reasonably calculated to give actual notice" to Ooki DAO.  (Opp. 11 (citing Cal. Civ. Pro. Code § 413.30).)  For that to be true, the Commission must demonstrate that the members of Ooki DAO (*i.e.*, the token holders who took votes to modify, operate, market, or take other actions with respect to the Ooki Protocol (Compl. ¶ 2) from August 24, 2021 to September 22, 2022—

-2-

1    what the Complaint calls, the "DAO Relevant Period") were likely to see those posts.    But the

2    Commission's Opposition and supporting Declaration include no argument or evidence that relates in any

3    way to those voting token holders identified by the Complaint.    That alone is a sufficient basis to deny the

4    Commission's Motion.

5         **1.**   **The Commission must demonstrate that its method of service was likely to**
6               **provide actual notice to the voting token holders identified in the Complaint.**

7       At the outset, it is necessary to clarify the issue before the Court.    The Commission pursued this

8    case on the theory that the members of an unincorporated association called "Ooki DAO" are a particular,

9    defined group of individuals.    On the face of the Complaint, the clear targets of the Commission's action

10    are token holders who took specific votes with respect to the Ooki Protocol during the DAO Relevant

11    Period.    The Complaint alleges that Ooki DAO's "members," *i.e.*, those particular voting token holders:

12    (1) "enter[ed] into [unlawful] retail commodity transactions," (Compl. ¶ 56(a)); (2) "engag[ed] in

13    soliciting or accepting orders for agreements, contracts or transactions," (Compl. ¶ 64(a)); (3) "fail[ed] to

14    register with the Commission as a [futures commission merchant]," (Compl. ¶ 65); and (4) "fail[ed] to

15    implement Know-Your-Customer policies and procedures," (Comp. ¶ 70).    Notably, for each of these

16    allegations, the Commission did not identify anyone apart from those voting token holders.

17       Recognizing the flaw in its theory as it relates even to something as simple as service, the

18    Commission's Opposition tries to walk back its prior focus on the voting token holders during the DAO

19    Relevant Period and now asserts that its theory actually covers the Ooki DAO "community." (Opp. 8.)

20    According to the Opposition, the Commission "sued the Ooki DAO—and only the Ooki DAO," and would

21    need to "institute a subsequent action . . . at some point in the future" if it wished to target individual token

22    holders.    (Opp. 10, 14.)    Similarly, the Complaint consistently alleges that the Ooki DAO acted "by and

23    through" its token holders who took specific votes during the DAO Relevant Period (Compl. ¶¶ 56, 64,

24    65, 70), while the Opposition claims that Ooki DAO took a number of actions directly.    For example, the

25    Opposition claims "that Ooki DAO held a non-binding 'snapshot vote'" (Opp. 9), while the Complaint

26    alleges that the *Founders*, not the DAO, "proposed" a snapshot vote in the bZx Forum.    (Compl. ¶ 44.)

27       The Court should reject the Commission's attempt to retreat from the flawed theory on which it

28    charged this case.    The Commission cannot argue that service was effective because it reached the broader

SULLIVAN & CROMWELL LLP

1   "community" (Opp. 8), while simultaneously alleging in the Complaint that the law was violated by and

2   through a precisely defined (and more limited) group of token holders who took particular votes in the

3   past.  Instead, the Commission must show that its proposed method of service was reasonably calculated

4   to provide actual notice of this suit to the specific voting token holders that are the subject of the

5   Commission's allegations.  (Compl. ¶ 56.)  As explained below, it cannot.

6              **2.      The Commission has not shown that service through a Help Chat Box or**
7                        **Online Forum would provide actual notice to voting token holders.**

8          Under California law, "'actual notice' . . . means genuine knowledge of the party litigant." *Ellard*

9   v. *Conway*, 114 Cal. Rptr. 2d 399, 404 (Cal. Ct. App. 2001) (citations omitted).  When a proposed method

10  of service is not likely to result in "genuine knowledge" for the *party being served*, it must be denied.  *See*

11  *Asiacell Comms. PJSC* v. *Doe I*, 2018 WL 3496105, at *3–4 (N.D. Cal. July 20, 2018) (rejecting

12  alternative service via email, a Facebook post, and Facebook Messenger when there was no evidence of

13  "prior successful communication" between the parties via those addresses or platforms); *LawRank LLC*

14  v. *LawRankSEO.com*, 2021 WL 4461592, at *2 (N.D. Cal. Sept. 29, 2021) (rejecting alternative service

15  via email when there was no evidence that the defendant conducted business through or otherwise used

16  that email address).

17         The Commission has not demonstrated that its proposed method of service is reasonably calculated

18  to reach the specific voting token holders who (according to the Complaint) constitute Ooki DAO.  In fact,

19  the relevant portion of its Opposition makes no reference to that class of token holders at all.  (Opp. 11–

20  12.)  Instead, the Commission hangs its argument entirely on the idea that actual notice occurred following

21  its post on the Chat Box and Online Forum.  (Opp. 8–9.)  According to the Commission, actual notice can

22  be inferred from discussions of its Complaint on a Telegram channel, Online Forum, and Twitter account

23  associated with Ooki DAO.  (*Id*.)  Specifically, the Commission alleges that:

24         •   "Multiple participants in the Telegram channel discussed the Commission's complaint
25             against the Ooki DAO."  (Snyder Decl., Nov. 21, 2022, ¶ 5.)

26         •   "[A] post appeared in the Ooki DAO's Online Forum titled 'Future of Ooki DAO' that was
27             'geared towards beginning discussion among DAO community members as to the
28             appropriate response to the CFTC complaint.'"  (Snyder Decl., Nov. 21, 2022, ¶ 7.)

-4-

1    • "[T]he Ooki DAO held a non-binding 'snapshot vote' regarding potential responses to the

2        Complaint to gauge support for these proposals."  (Snyder Decl., Nov. 21, 2022, ¶ 9.)

3    *Not a single one of these allegations* is specific to the particular voting token holders discussed in

4    the Complaint.  On the contrary, a post on the Online Forum suggested that it was used by a much broader

5    class of individuals who may have some general interest in the Ooki Protocol and may not include any of

6    the specific voting token holders whom the Commission alleges comprise the Ooki DAO.  (Snyder Decl.,

7    Nov. 21, 2022, ¶ 6 ("We expect this forum to be populated by participants within the projects [sic]

8    expanding ecosystem. If you hold Ooki Tokens, use the protocol, or plan on developing/are developing

9    on the protocol this is the place to be!").)  Moreover, the Commission only cites Online Forum discussions

10   related to this litigation, not to the conduct relevant to the Commission's theory of liability (*e.g.*, voting to

11   disburse funds from the Treasury for marketing the Protocol).  On this record, there is no basis to conclude

12   that individual Ooki DAO token holders who voted during the DAO Relevant Period have "genuine

13   knowledge" of this suit or will gain that knowledge through the Commission's proposed method of

14   service.

15       **B.    Ooki DAO is Not an Unincorporated Association.**

16       The Commission's Motion for Alternative Service must be denied for a second and

17   independent reason:  Ooki DAO is not an unincorporated association at all.

18       **1.    The Court Can and Should Reject the Commission's Unincorporated
                  Association Theory Now.**
19

20       The Commission's lead argument in defense of its unincorporated association theory is that the

21   Court should defer judgment until the motion to dismiss stage. (Opp. 16.)  But deferring judgment to that

22   point is procedurally unwarranted and substantively unsound.  The Commission has brought suit against,

23   and purports to have served, Ooki DAO, but has not established that Ooki DAO is the sort of entity that

24   could stand as a proper defendant in this suit.  If the Commission's suit moves forward, it is very likely to

25   result in a default judgment.  This stage is the appropriate—indeed, likely the only—time to adjudicate

26   the Commission's unprecedented theory on unincorporated associations.

27       Further, as the Commission makes clear, a default judgment would leave any individual voting

28   token holder jointly and severally liable. (Opp. 13.)  But the Commission asserts that in any future action

-5-

SULLIVAN & CROMWELL LLP

1   to collect on that judgment, "an alleged individual member would have the opportunity to present any

2   applicable defenses to his or her alleged membership in the Ooki DAO or other defenses as the member

3   sees fit." (Opp. 14).  Notably, the Commission *does not* assert that a future defendant could challenge the

4   Ooki DAO's status as an unincorporated association in the first place, or the liability of the DAO (which

5   would have been decided in the unopposed default judgment).  And if an individual defendant did raise

6   such an argument, it would come after this Court already determined that the DAO is a proper defendant

7   that could be sued in this litigation and was liable.

8        The Catch-22 is plain:  the Commission is asking this Court to avoid the central question today,

9   even though it would likely have no opportunity to answer that question tomorrow.  Courts routinely

10  resolve contested issues when determining whether to grant a motion for alternative service, and the Court

11  should follow the same course here.  *See Rockefeller Tech. Inv. (Asia) VII* v. *Changzou SinoType Tech.

12  Co.*, 460 P.3d 764, 77374 (Cal. 2020) (interpreting an arbitration contract between the parties to determine

13  if service had to conform to the procedures set forth in the Hague Convention); *Schnell* v. *Nat'l Flood

14  Insurer's Ass'n*, 520 F. Supp. 150, 156 (D. Colo. 1981) (holding that service was improper against alleged

15  unincorporated association because the association named in the Complaint "no longer exists").

16       The Commission cites two cases to contend that "courts routinely authorize service on entity

17  defendants without [evaluating whether] the defendant is, in fact, the type of entity covered by the

18  assertedly applicable service provision." (Opp. 16.)  Both cases involved attempted service on a foreign

19  entity, and the Commission asserts that the courts never addressed whether the entity was in fact foreign.

20  (Opp. 16.)  But in neither case was that actually an issue in dispute.  In *Rio Properties*, the Ninth Circuit

21  permitted service by email on a foreign defendant when it clearly controlled the email address that the

22  plaintiff used to provide service.  *See Rio Properties, Inc.* v. *Rio Int'l Interlink*, 284 F.3d 1007, 1014–16

23  (9th Cir. 2002).  Here, by contrast, the Commission has not shown that voting token holders use the Chat

24  Box or Online Forum.  *Supra*, at 5.  Nothing in *Rio Properties* remotely suggests that a court should ignore

25  the allegations regarding the entity status of the named defendant when assessing a service motion that

26  relies on a particular, disputed assertion regarding entity status.  On the contrary, the Ninth Circuit said

27  that it is in the "discretion of the district court to balance the limitations of [alternative] service against its

28  benefits in any particular case."  284 F.3d at 1018 (citations omitted).  The Commission's second case

-6-

1   similarly involved no dispute over whether the foreign entity operated the email the plaintiff used to serve

2   the complaint.  *See Michael Kors, LLC* v. *Individuals, P'ships and Unincorporated Assocs.*, 2020 WL

3   8231117, at *1–2 (S.D. Fla. Dec. 4, 2020).  Simply put, these cases do not justify putting off any scrutiny

4   of the Commission's novel unincorporated association theory, and nothing prevents the Court from

5   reaching that central issue now.

6               **2.      As Alleged in the Complaint, Ooki DAO is Not an Unincorporated**

7                        **Association.**

8               The Commission agrees with Amicus that an unincorporated association is "a voluntary group of

9   persons [1] formed by *mutual consent* [2] for the purpose of promoting a *common objective*."  (Opp. 17

10  (emphasis added).)  According to the Complaint, both of those conditions are satisfied any time a group

11  of people hold tokens and vote those tokens to modify a decentralized protocol.  (Compl. ¶ 4.)  That theory

12  misunderstands the relationship between DAO token holders and would greatly expand the concept of

13  "unincorporated associations."  (DeFi Br. 6–9.)

14              Mutual Consent:  The Commission argues that voting token holders during the DAO Relevant

15  Period formed a group by mutual consent because "Ooki Token holders voluntarily vote their tokens."

16  (Opp. 17.)  But a token is simply a piece of technology that can allow its holder, when used in connection

17  with a set of smart contracts, to express a particular view.  People who use Change.org to vote on political

18  proposals or who participate in a Twitter poll do not become part of an unincorporated association with

19  every other person who casts a vote.  Similarly, when token holders vote on what the Founders should do

20  on the website, they are not automatically transformed into a legal association with other token holders.

21  In that situation, it is the Founders or some other individuals who have the necessary privileges to act (or

22  not) on the token holders' preferences.

23              The breadth of the Commission's theory proves the point.  Despite the Complaint's narrow focus

24  on a specific group of token holders who voted during the DAO Relevant Period, its Opposition suggests

25  that Ooki DAO's membership may include *all* Ooki token holders regardless of when they vote or what

26  votes they take.  (Opp. 17 (characterizing Ooki DAO's membership as including all voting token holders)).)

27  On that view, all token holders would be liable for any conduct supposedly committed by Ooki DAO,

28  even if it occurred before the tokens were merely acquired and even if their later votes had nothing to do

SULLIVAN & CROMWELL LLP

-7-

with the protocol operations or website solicitations that the Commission alleges are unlawful.  It is not clear how today's token holders could consent to liability for past conduct simply by acquiring and voting a governance token.  Similarly, a prior token holder may have voted its tokens, then sold before any allegedly unlawful activity took place.  Even a new token holder voting to rectify any allegedly unlawful conduct supposedly committed by Ooki DAO would not escape liability if the Opposition's theory was valid.

Common Objective:  The Commission next argues that all Ooki token holders share a common objective because *some* of the token holders "direct[ed] the operation of, market[ed], and ma[de] available to the public . . . the Ooki Protocol[.]"  (Opp. 18.)  Here again, that is not what the Complaint says.  Under the new theory articulated in its Opposition, the Commission is not pursuing a claim against a group of people who took specific actions to manage or promote a protocol; it took this action against a group of people just because they have or may in the future *vote tokens*.  Those token holders may never intend to vote their tokens for an unlawful purpose, and may never know or interact with other token holders on internet channels or other fora.  The Commission's theory turns on token-voting alone, and nothing about token-voting establishes a common purpose.

This Court's decision in *Niantic, Inc.* v. *Global++* is instructive.  *Niantic* held that "an association of hackers" could be sued as an unincorporated association under the Copyright Act.  2019 WL 8333451, at *1, 3 (N.D. Cal. Sept. 26, 2019).  The Court reached that result because the hackers worked together in "creating, distributing, and profiting" from unauthorized derivative versions of mobile apps.  *Id*.  As *Niantic* and a host of similar cases explain, some shared aim and active collaboration among members is central to the concept of an unincorporated association.  *See, e.g.*, *Seattle Affiliate of Coal. to Stop Police Brutality* v. *Seattle*, 2005 WL 3418415 (W.D. Wash. Dec. 12, 2005) (discussing a political advocacy organization); *NCAA* v. *Jones*, 1 S.W.3d 83, 85 (Tex. 1999) (describing the National Collegiate Athletic Association as a "voluntary, unincorporated association"); *Associated Press* v. *Mont. Senate Republican Caucus*, 951 P.2d 65 (Mont. 1997) (noting that the caucus members "meet to discuss and promote common objectives").  That is precisely what is missing here—nothing about owning and voting a token on its own evinces a common pursuit with other token holders any more than other forms of online expression of

-8-

1   views.  *See Brown* v. *Fifth Judicial Dist. Drug Task Force*, 255 F.3d 475, 477 (8th Cir. 2001) ("Every

2   group that is not a corporation or partnership is not automatically an unincorporated association.").

3        This is not to say that token holders of a DAO could never form a group through activities beyond

4   voting their tokens.  For instance, if the Commission limited its theory to token holders who came together

5   to operate a traditional business, that *could* establish an association—although it is unclear why the

6   Commission could not rely on traditional aiding and abetting principles in that situation.   But the

7   Commission is asking the Court to adopt a novel theory that rests solely on token-voting, even though that

8   theory is a clear departure from the cases on which the Commission relies.  (Opp. 17 n.16 (citing *So. Cal.*

9   *Darts Ass'n* v. *Zaffina*, 762 F.3d 921, 927 (9th Cir. 2014).)

10       To defend its theory, the Commission argues that it is irrelevant that some token holders may not

11  actually vote their tokens on every modification proposal or participate in other activities regarding Ooki

12  DAO.  (Opp. 21 (citing *Satanic Temple, Inc.* v. *City of Scottsdale*, 423 F. Supp. 3d 766, 773 (D. Ariz.

13  2019).)  As the Commission sees it, the differences among token holders are no more meaningful than the

14  differences that might emerge among any social organization, such as a "voluntary group of persons who

15  met weekly and agreed to proceed with organization of the Arizona chapter of The Satanic Temple to

16  promote pluralism."  *Satanic Temple*, 423 F. Supp. 3d at 773.  But the question here is not how voting

17  token holders might differ; it is whether, despite those differences, they share the requisite common

18  purpose in the first place.  That was the critical fact in *Satanic Temple* and the other decisions cited by the

19  Commission, and that is what is missing here.  Nothing about voting a token inherently provides a common

20  purpose remotely comparable to those shared by advocacy groups and civic organizations.  For instance,

21  if a token holder votes only to change a DAO's name, it is nonsensical to conclude that the token holder

22  has expressed a common objective to use funds to solicit off-exchange retail commodity transactions, or

23  any of the other unlawful activities charged by the Commission here.

24       The Commission also suggests that Ooki DAO is an unincorporated association because a

25  predecessor technology, the bZx Protocol, was managed by a limited liability company rather than a DAO,

26  and because various commentators have suggested that Ooki token holders should consider using LLCs

27  to structure or manage their affairs.  (Opp. at 18–20.)  Both points are irrelevant.  Just because a group of

28  persons *could* manage a protocol as an organized group (whether incorporated or unincorporated) does

-9-

1  not mean that all protocols *must* be controlled by such an entity.  It is not even clear that a DAO *could* be

2  organized in the manner the Commission suggests—for example, as a limited liability company.[1]  But it

3  is also irrelevant that bZx LLC once had a role in managing the bZx Protocol.  As for the Commission's

4  reliance on articles discussing the legal status of DAOs, the consistent thread of those pieces is legal

5  uncertainty.  One article notes that the legal status of a DAO is "uncertain at best" and that some states

6  have adopted special rules to facilitate DAO's becoming legal entities when their activity is sufficiently

7  similar to the activity of a legal entity.[2]  Another notes that DAO token holders may vote to establish

8  "bridge entities" that are separate from the DAO itself to act on behalf of the token holders.[3]  Such a

9  proposal would be illogical if a DAO was already an association able to contract and pursue claims in its

10  own name.  It is telling that the Commission relies more on these articles than on decisions from any court

11  to advance its position here.

### C.   The Commission Has Not Demonstrated That Service Took Place in the United States.

14      The Commission's Motion for Alternative Service claims that it complied with the procedures for

15  serving "a corporation, partnership, or other unincorporated association . . . in a judicial district of the

16  United States."  (Opp. 10 (citing Fed. R. Civ. P. 4(h)(1).)  Regardless of the Court's resolution of other

17  disputed issues, the Commission's failure to demonstrate that service on Ooki DAO took place within the

18  United States is a sufficient ground to deny its Motion.

19      Rule 4 establishes one set of procedures for serving unincorporated associations within the United

20  States (*see* Fed. R. Civ. P. 4(h)(1)), and a different set of procedures for serving unincorporated

21  associations outside the United States (*see id.* 4(h)(2)).  Here, the Commission has not put forward any

22  allegations or facts showing that it served Ooki DAO in a "judicial district of the United States."  (Opp.

---

[1] For example, adding new members to an LLC may require amending an operating agreement or taking a vote of the current membership.  *See, e.g.*, Del. Code tit. 6, § 18-704(a).  Those requirements may be incompatible with a DAO where tokens change hands frequently.

[2] Zach Smith & David Swegle, *The Legal Status of Decentralized Autonomous Organizations: Do DAOs Require New Business Structures?  Some States Think So.*, Heritage Found. (Jan. 1, 2022), https://www.heritage.org/government-regulation/commentary/the-legal-status-decentralized-autonomous-organizations-do-daos.

[3] Jason Gottlieb, Daniel Isaacs & Alexandra Wang, *How to do Business as a DAO*, CoinDesk (Oct. 20, 2021), https://www.coindesk.com/policy/2021/10/20/how-to-do-business-as-a-dao/.

-10-

10).  Both its Motion for Alternative Service and its Opposition assume that Rule 4(h)(1) applies, without any discussion of why service via the Online Forum and Chat Box should be assessed under that provision. (*See Mot. for Alternative Service*, ECF No. 11, at 7; Opp. 10.)  Courts have previously rejected attempts to serve an unincorporated association through the procedures authorized by Rule 4(h)(2).  *See Freedom Watch, Inc.* v. *Org. of Petroleum Exporting Countries*, 107 F.Supp.3d 134, 135–36 (D.D.C. 2015).  Those same limits may apply here, and until the Commission demonstrates that Rule 4(h)(1) provides the applicable framework, this Court should reject its proposed method of service.  *See Neumont Univ. LLC* v. *Nickles*, 304 F.R.D. 594, 600 (D. Nev. 2015) (noting that service by email could be "inconsistent with an international agreement").

## II.    THE COMMISSION'S UNPRECEDENTED THEORY IS HARMFUL AND UNNECESSARY

### A.    The Commission's Approach Would Allow it to Evade Important Limits on Accomplice Liability.

To impose liability as an aider and abettor under the CEA, the Commission must demonstrate that the named defendant "(1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective."  *BMA LLC* v. *HDR Global Trading Ltd.*, 2021 WL 949371, at *14 (N.D. Cal. 2021) (Orrick, J.) (citations omitted); *see also In re Barclays*, CFTC No. 12-25, at 27 (June 27, 2012).  That test prevents the Commission from pursuing an individual who had no knowledge of the legal violations committed by a principal and did not take acts to further those violations.  *See, e.g.*, *SEC* v. *Peretz*, 317 F. Supp. 2d 58, 64 (D. Mass. 2004) (dismissing an aiding and abetting claim under the Exchange Act because the defendant "did not knowingly provide assistance to [the principal's] securities fraud," even though the two individuals had an ongoing business relationship).

Here, the Commission seeks to circumvent the CEA's limitations on aiding and abetting liability. Under the expansive view of unincorporated associations reflected in the Commission's Opposition, there is no need to ask whether a potential accomplice meets those requirements; it is enough to simply lump the primary violator and the alleged secondary actors together in an unincorporated association.  This case illustrates the point.  The Commission has already pursued an enforcement action against the Founders of

-11-

the Ooki Protocol, who were on record describing efforts to circumvent the law.  (Opp. 2, n.4.)  By bringing this separate action, the Commission apparently believes that there are others who are culpable for assisting the Founders in their efforts.  But rather than going through the trouble of identifying individuals who had the requisite knowledge and intent and who provided actual assistance, the Commission is pursuing its claim against voting token holders as a group.

The implications of the Commission's theory extend far beyond the CEA.  Many federal statutes define the word "person" to include "associations."  *See, e.g.*, 33 U.S.C. § 1321 (Clean Water Act); 42 U.S.C. § 9601(21) (CERCLA).  Moreover, the federal definition of "exchange" under the Exchange Act includes a "group of persons, whether incorporated or unincorporated."  15 U.S.C. § 78c.  If the Commission prevails here, federal regulators or private parties pursuing claims under any of those statutes would be able to rely on the Commission's capacious definition of unincorporated associations, and hold whole groups of different actors liable (jointly and severally) without ever establishing their individual liability.

That result is not only disruptive and unprecedented, it is also inconsistent with Congress's judgment.  Congress has carefully defined who can be held liable for aiding and abetting, facilitation, or other forms of accomplice liability under federal law.  Under the securities laws, for instance, Congress has authorized only the federal government to pursue aiders and abettors, preventing private plaintiffs from doing the same. *See Cent. Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994).  And Congress has written different scienter standards for accomplices under different statutes, requiring intent for some but only recklessness for others. *See* 15 U.S.C. § 80a-47(b); 15 U.S.C. § 77o(b).

Congress clearly knows how to explicitly authorize more expansive forms of accomplice liability when it determines that doing so is appropriate.  Many federal statutes authorize suits against conspiracies, which can on occasion make individuals liable for conduct committed by co-conspirators even if they are not aware of it. *See, e.g.*, 42 U.S.C. § 1985 (conspiracy to interfere with civil rights); *see Perez* v. *Foulk*, 2016 WL 1107900, at *3 (E.D. Cal. Mar. 22, 2016).  For the Racketeer Influenced and Corrupt Organizations Act (RICO), which can give rise to private suits for treble damages, Congress defined an "enterprise" to include *both* an "association" and a "group of individuals associated in fact." 18 U.S.C.

-12-

§ 1961(4); *see Boyle* v. *United States*, 556 U.S. 938, 944 (2009).  But under the Commission's theory, each of those congressional judgments would be meaningless.  There would be no need to prove a conspiracy because any tenuously connected group of people could be sued as an unincorporated association.  *See InterAmerican Refining Corp.* v. *Sup. Ct. of Venezuela*, 224 F. Supp. 35, 36 (S.D.N.Y. 1963) (rejecting an attempt to serve every member of an alleged conspiracy through service on one co-conspirator, reasoning that such a theory would "bring in persons from all over the country . . . without regard to whether the other defendants were inhabitants of, may be found, or transacted business within the district").  Such a result would be even more anomalous in the context of the CEA, where Congress has not even seen fit to grant the Commission authority to pursue general "conspiracy" liability, opting to stop at "aiding and abetting" liability instead.  Recognizing the Commission's overbroad "unincorporated association" theory of liability here would subvert these Congressional judgments contained in the CEA, and have numerous and significant spillover implications for other statutory contexts.  "Congress . . . does not, one might say, hide elephants in mouseholes," *Whitman* v. *American Trucking Assocs.,* 531 U.S. 457, 468 (2001) (citation omitted), but that would be the effect of permitting the novel unincorporated association theory to proceed here.

The Commission's Opposition has little to say about the broad consequences of their novel approach.  Instead, they ask the Court to trust that the Commission will, "in its discretion," shield token holders, not to mention other individuals in other contexts, from unwarranted liability.  (Opp. 14, 16.) This of course says nothing about what will limit the plaintiffs' bar from pursuing these same theories. But in any event, protections from government overreach are not left "at the mercy of *noblesse oblige*," *United States* v. *Stevens*, 559 U.S. 460, 480 (2010); they come from enforcing statutory limits on agencies as written.

### B.    The Commission's Approach Harms Token Holders and Inhibits Innovation.

The unincorporated association theory reflected in the Commission's Opposition would hold token holders *jointly and severally liable* for judgments entered against a DAO, even if they had nothing to do with (and were not even aware of) the actions with respect to the protocol that allegedly violated federal law.  As the Commission recognizes, many token holders may vote their tokens for reasons unrelated to any plausible legal violation.  For instance, the Complaint notes that bZx token holders voted to

-13-

Sullivan & Cromwell LLP

compensate the victims of a security breach,  (Compl. ¶ 45)—a vote the Commission acknowledges was lawful (Opp. 18 n.17).   If the Commission's sweeping theory of liability is accepted, however, individuals interested in voting tokens for purely lawful reasons will face joint and several liability.

Legal liability—or at best, uncertainty—for voting token holders would thwart the development of an innovative and growing technology.  Developers are currently exploring how DAOs can be used to solve a host of social problems, such as managing charitable giving. *See* Yonca Braeckman, *Philanthropy DAOs—The Future of Giving*, Medium (Feb. 17, 2022), https://medium.com/impact-shakers/philanthropy-daos-the-future-of-giving.  But expanded liability for DAO token holders is certain to chill these efforts—particularly if new token holders could be held liable for conduct that took place in the past.[4]

### C.     The Commission's Approach is Unnecessary to Enforce the CEA.

The Commission's decision to press its novel theory would be more understandable if such a theory were required to vindicate federal law.  In fact, the Commission's Opposition concludes by asking the Court to consider the "evasive purpose" of the bZx Founders when deciding this Motion.  (Opp. 22–23.)   But the Commission's expansive view of unincorporated associations is not necessary to deter misconduct or to address ongoing legal violations.  The Commission has already brought a successful enforcement action against the Founders who tried to evade the law. *See In re bZeroX, LLC, et al.*, CFTC Docket No. 22-31, 2022 WL 4597664 (Sept. 22, 2022).

To the extent the Commission believes that other individuals assisted the Founders in that violation, they can seek to hold them liable as accomplices—assuming they can put forward the necessary facts to prove such a claim.  But at present, the Commission has not identified any individual token holders who fall into that category, and instead has opted to seek to evade its own procedural and substantive obligations in bringing suit.

---

[4] This concern is particularly heightened in the securities context.  The Securities Act of 1933 includes a definition of "person" very similar to the definition in the CEA.  15 U.S.C. § 77b.  If some tokens traded on a protocol are designated as securities, the SEC or private plaintiffs may pursue securities claims that would reach every DAO token holder based on the Commission's unincorporated association theory.

1

**CONCLUSION**

2       The Commission's proposed method of service is not reasonably calculated to notify the Defendant

3   of this suit and incorrectly presumes that Ooki DAO is an entity that can be served.  Given those and other

4   defects, Amicus requests that the Court reconsider its decision granting the Commission's Motion for

5   Alternative Service.

6

7   Dated:  November 21, 2022                           Respectfully submitted,

8                                                       SULLIVAN & CROMWELL LLP

9                                                       */s/ Laura Kabler Oswell*
                                                        Laura Kabler Oswell (SBN 241281)
10                                                      1870 Embarcadero Road
                                                        Palo Alto, CA 94303
11                                                      Tel.: (650) 461-5600
                                                        Fax: (650) 461-5700
12                                                      oswelll@sullcrom.com

13                                                      Ann-Elizabeth Ostrager (*pro hac vice*)
                                                        James M. McDonald (*pro hac vice*)
14                                                      125 Broad Street
                                                        New York, NY 10014
15                                                      Tel.: (212) 558-4000
                                                        Fax: (212) 558-3588
16                                                      ostragerae@sullcrom.com
                                                        mcdonaldj@sullcrom.com
17

18                                                      Daniel J. Richardson (*pro hac vice*)
                                                        1700 New York Ave. NW
19                                                      Washington, DC 20006
                                                        Tel.: (202) 956-7500
20                                                      Fax: (202) 293-6330
                                                        richardsond@sullcrom.com
21

22                                                      *Counsel for Amicus Curiae DeFi Education Fund*

23

24

25

26

27

28

SULLIVAN & CROMWELL LLP

-15-

1

2                    **<u>Attestation Pursuant to Local Rule 5-1(i)(3)</u>**

3              Pursuant to Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document

4   has been obtained from each of the other signatories.

5                                              <u>*/s/ Laura Kabler Oswell*</u>
                                               Laura Kabler Oswell (SBN 241281)
6                                              1870 Embarcadero Road
                                               Palo Alto, CA 94303
7                                              Tel.: (650) 461-5600
                                               Fax: (650) 461-5700
8                                              oswelll@sullcrom.com

9                                              *Attorney for Amicus Curiae DeFi Education Fund*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SULLIVAN & CROMWELL LLP

-16-