1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| Commodity Futures Trading Commission, <br><br> Plaintiff, <br><br> v. <br><br> Ooki DAO (formerly d/b/a bZx DAO), an unincorporated association, <br><br> Defendant. | **CIVIL ACTION NO: 3:22-cv-05416-WHO** <br><br> **Hon. William H. Orrick** <br><br> **[PROPOSED] ORDER FOR FINAL JUDGMENT BY DEFAULT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANT OOKI DAO** |

On September 22, 2022, the Commodity Futures Trading Commission ("Commission" or "Plaintiff") filed a Complaint charging Defendant Ooki DAO ("Ooki DAO" or "Defendant") with violating Sections 4(a) and 4d(a)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6(a), 6d(a)(1), and Commission Regulation ("Regulation") 42.2, 17 C.F.R. § 42.2 (2021).

On December 20, 2022, Defendant was properly served with the summons and Complaint pursuant to Rule 4(h)(1)(A) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") by provision of the summons and Complaint through the Help Chat Box on the Ooki DAO's

- 1 -

website with contemporaneous notice posted on the Ooki DAO's online governance forum

("Online Forum").  ECF No. 63 (deeming service via such method complete as of December 20,

2022).

Defendant has failed to appear or answer the Complaint within the time permitted by Fed.

R. Civ. P. 12(a)(1).  Accordingly, the Commission filed motions for entry of a clerk's default

against Defendant, and on January 17, 2023, the Clerk of this Court entered a default against

Defendant.

The Commission has moved this Court to grant final judgment by default against

Defendant, order permanent injunctive relief, and impose a civil monetary penalty.

The Court has carefully considered the Complaint, the allegations of which are well-

pleaded and hereby taken as true, the Commission's memorandum in support of its motion, the

record in this case, and the Court being otherwise advised in the premises, it is hereby:

**ORDERED** that the Plaintiff's Motion for Final Judgment by Default, Permanent

Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief against Defendant

("Motion") is **GRANTED.**  Accordingly, the Court enters findings of fact, conclusions of law,

and an Order of Final Judgment by Default for Permanent Injunction, Civil Monetary Penalties,

and Other Statutory and Equitable Relief ("Order") pursuant to Section 6c of the Act, 7 U.S.C. §

13a-1, as set forth herein.

## I.      FINDINGS OF FACT

### A.  The Parties

1.      Plaintiff **Commodity Futures Trading Commission** is an independent federal

regulatory agency that is charged by Congress with administering and enforcing the Act,

7 U.S.C. §§ 1–26, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2022).

ORDER OF DEFAULT JUDGMENT

2.      Defendant **Ooki DAO**, formerly doing business as the bZx DAO, is an unincorporated association comprised of holders of OokiDAO Tokens ("Ooki Tokens") (or of BZRX Tokens, when the Ooki DAO was doing business as the bZx DAO) who have voted those tokens to govern (e.g., to modify, operate, market, and take other actions with respect to) the Ooki Protocol (formerly named the bZx Protocol) during the DAO Relevant Period.  The Ooki DAO has never been registered with the Commission in any capacity.

### B.  Overview of Unlawful Conduct

3.      From approximately June 1, 2019 to approximately August 23, 2021 (the "bZx Relevant Period"), bZeroX, LLC ("bZeroX") designed, deployed, marketed, and made solicitations concerning a blockchain-based software protocol (the "bZx Protocol") that accepted orders for and facilitated margined and leveraged retail commodity transactions (functioning similarly to a trading platform).  The bZx Protocol permitted users to contribute margin (collateral) to open leveraged positions whose ultimate value was determined by the price difference between two virtual currencies from the time the position was established to the time it was closed.  The bZx Protocol purported to offer users the ability to engage in these transactions in a decentralized environment—i.e., without third-party intermediaries taking custody of user assets.  In addition, bZeroX failed to conduct know-your-customer ("KYC") diligence on its customers as part of a customer identification program ("CIP").

4.      On approximately August 23, 2021, bZeroX transferred control of the bZx Protocol to the bZx DAO, a decentralized autonomous organization ("DAO"), which subsequently, on approximately December 18, 2021, renamed itself and is now doing business as the Ooki DAO.  The Ooki DAO is an unincorporated association comprised of holders of Ooki Tokens who vote those tokens to govern (e.g., to modify, operate, market, and take other actions with respect to) the bZx Protocol (which the Ooki DAO has renamed the "Ooki Protocol").

5. A key bZeroX objective in transferring control of the bZx Protocol (now the Ooki Protocol) to the bZx DAO (now the Ooki DAO) was to attempt to render the bZx DAO, by its decentralized nature, enforcement-proof. Put simply, the two individuals who controlled bZeroX (the "bZx Founders") believed they had identified a way to violate the Act and Regulations, as well as other laws, without consequence. A bZx Founder so stated on a call with bZeroX community members prior to transferring control of the bZx Protocol to the bZx DAO:

> It's really exciting. We're going to be really preparing for the new regulatory environment by ensuring bZx is future-proof. So many people across the industry right now are getting legal notices and lawmakers are trying to decide whether they want DeFi companies to register as virtual asset service providers or not – and really what we're going to do is take all the steps possible to make sure that when regulators ask us to comply, that we have nothing we can really do because we've given it all to the community.[1]

6. From approximately August 23, 2021 to the present (the "DAO Relevant Period"), the Ooki DAO[2] has operated, marketed, and made solicitations concerning the Ooki Protocol[3] that accepted orders for and facilitated margined and leveraged retail commodity transactions. The Ooki DAO exists for the exact same purpose as bZeroX before it—to run a business, and specifically, to operate and monetize the Ooki Protocol. The Ooki DAO has done so through the votes of Ooki Token holders (or of BZRX Token holders, when the Ooki DAO was doing business as the bZx DAO) who, through their votes, chose to participate in running that business. Just like the bZx Protocol during the bZx Relevant Period, the Ooki Protocol

---

[1] In an Order filed concurrently with the Commission's Complaint, bZeroX and the bZx Founders resolved charges with the Commission in connection with their unlawful conduct. *See In re bZeroX, LLC, Tom Bean, and Kyle Kistner*, CFTC No. 22-31, 2022 WL 4597664 (Sept. 22, 2022) (consent order) ("bZeroX Administrative Order").

[2] Herein, "Ooki DAO" refers to the "Ooki DAO, formerly doing business as the bZx DAO during the DAO Relevant Period."

[3] Herein, "Ooki Protocol" refers to the "Ooki Protocol, formerly named and operating as the bZx Protocol during the DAO Relevant Period."

during the DAO Relevant Period has permitted, and continues to permit, users to contribute

margin (collateral) to open leveraged positions whose value is determined by the price difference

between two virtual currencies from the time the position is established to the time it is closed.

The Ooki Protocol purports to offer users the ability to engage in these transactions in a

decentralized environment—i.e., without third-party intermediaries taking custody of user assets.

In addition, the Ooki DAO does not conduct KYC diligence on its customers (and in fact

advertises the lack of KYC requirements as a positive feature of the Ooki Protocol) as part of a

CIP.

### C.  During the bZx Relevant Period, bZeroX and the bZx Founders Designed, Deployed, Operated, Marketed, and Controlled the bZx Protocol.

7.      A blockchain is a distributed, shared, immutable ledger that facilitates the process

of recording transactions and tracking digital assets in a consensus-based network.  A "smart

contract" is a self-enforcing piece of computer code containing all terms of a contract—meaning

the software can execute the agreement contained in the contract without additional input from

the parties.

8.      During the bZx Relevant Period, the bZx Protocol was a collection of smart

contracts on the Ethereum blockchain that purported to facilitate transactions without

intermediaries.

9.      As set forth above, digital assets include virtual currencies.  Ether ("ETH") is the

Ethereum blockchain's native virtual currency.  In addition, Ethereum's ERC-20 token standard

permits the conversion of non-ETH virtual currencies into tokens that can be traded on

Ethereum.  For example, DAI is an ERC-20 token that can be transacted with on the Ethereum

blockchain and whose value is pegged one-to-one to the price of the U.S. dollar.

10.     The bZx Protocol enabled any person with an Ethereum wallet to contribute

margin (collateral) to open leveraged positions whose ultimate value was determined by the price

difference between two digital assets from the time the position was established to the time it was closed.  For example, if a trader believed that the price of ETH would rise relative to the price of DAI, the trader might open, for example, a 5x long position in ETH versus DAI (i.e., a position worth five times the increase in the price of ETH relative to DAI from the time the position was established and the time it was closed).  To do so, the trader would proceed as follows:

    a.    The trader would post collateral (e.g., ETH) to a bZx Protocol smart contract as margin to open the leveraged position.  (Notably, positions on the bZx Protocol were required to be overcollateralized—i.e., the value of the collateral was required to exceed the value of the borrowed asset.  This was to ensure repayment of the borrowed asset.  Prior to a trader closing an open position, if the position had lost too much value, the bZx Protocol was designed to facilitate the automatic liquidation of the position and retention and sale of the posted collateral to cover the loss.)

    b.    The smart contract would borrow DAI from a bZx Protocol liquidity pool, whose assets were supplied by liquidity providers who, in exchange, had received interest-generating tokens as well as BZRX Protocol Tokens ("BZRX Tokens") conferring voting rights on certain matters relevant to bZx Protocol governance.  (The BZRX Tokens conferred voting rights in proportion to the holder's percentage of total BZRX Tokens issued.  Additional BZRX Tokens were otherwise minted and allocated to certain individuals.)

    c.    The smart contract would exchange the borrowed DAI for ETH on a separate, on-chain decentralized exchange.

- 6 -

d.    The smart contract would lock (i.e., prevent from being withdrawn absent conditions expressly written into the smart contract) the newly received ETH and create a token representing the newly established 5x long position.

e.    The smart contract would send that token to the trader.

11.    If the trader was correct (i.e., that the price of ETH would rise relative to the price of DAI), the trader could redeem the token reflecting the position for a profit (i.e., the smart contract would transfer the resulting profit to the trader). If the trader was incorrect (i.e., the price of ETH did not rise relative to the price of DAI), the trader could still redeem the token, except instead of paying profits, the smart contract would retain however much of the collateral was needed to cover the loss.

12.    If the trader wished to open a short position, the trading mechanics would be similar, except the trader would borrow ETH and swap it into DAI. Traders could open similar positions involving various additional virtual currencies.

13.    The transactions on the bZx Protocol did not involve contracts of sale of digital assets; rather, they involved leveraged positions whose value was determined by the price difference between two digital assets. Positions on the bZx Protocol automatically rolled over every 28 days (and could thus exist perpetually) and could be liquidated at any time.

14.    bZeroX, through the bZx Founders, among others, developed a website to market, solicit orders for, and facilitate access to the bZx Protocol. For example, bZeroX's website claimed that it offered a superior margin trading experience because "[t]here is no need for any verification, KYC or AML." The website further claimed that bZeroX purportedly did not take custody of users' assets, and there were minimal liquidation penalties. The bZx Founders also made public statements, appeared in interviews, wrote articles, led calls with community

members that are publicly available on YouTube, and otherwise publicly marketed and solicited members of the public to utilize the bZx Protocol.  The bZeroX website enabled users, through the click of a few buttons, to transfer assets and open positions on the bZx Protocol using the mechanics described above.

15.     bZeroX collected fees from users, including origination fees, trading fees, and a percentage of interest paid to lenders.  bZeroX purports to have collected approximately $50,000 in fees prior to June 2020 and, between June 2020 and August 2021, approximately $500,000 in fees).[4]

16.     Prior to August 23, 2021 (at which time bZeroX transferred control of the bZx Protocol to the bZx DAO), bZeroX retained "administrator keys" ("Keys") permitting bZeroX to access and control the operation of, and the funds held in, the smart contracts involved in the above processes.  The Keys enabled bZeroX to, for example, update relevant smart contract code to adjust how the smart contracts operated; pause or suspend trading; pause or suspend contributions or withdrawals of assets and redemptions of tokens to close positions; and otherwise direct disposition of the funds held in the bZx Protocol smart contracts.

17.     During the bZx Relevant Period, bZeroX did not maintain a CIP and explicitly advertised the lack of KYC or AML compliance as a positive feature of the bZx Protocol. bZeroX offered any user anywhere in the world (including in the United States) the ability to trade on the bZx Protocol and, specifically, did not take any steps to exclude U.S. persons and/or non-ECPs from the bZx Protocol.

---

[4]     bZeroX represented that such fees were held in BZRX Tokens or 3CRV (a stablecoin that is redeemable for DAI, USDT, or USDC on Curve.Finance).  The listed figures reflect approximate conversions to U.S. Dollars as of approximately September 14, 2021.

18.     At least twice during the bZx Relevant Period, third parties engaged in manipulative conduct on the bZx Protocol that resulted in the loss of customer funds. Specifically, on approximately February 14 and 17, 2020, one or more anonymous users entered into transactions on the bZx Protocol and other platforms that resulted in user(s) allegedly: (1) intentionally defaulting on a bZx Protocol loan which the user had allegedly deliberately undercollateralized by borrowing assets at a price the user had, allegedly, intentionally artificially deflated through arbitrage trades across various platforms; and (2) manipulating pricing "oracles" (i.e., third-party pricing sources on which the bZx Protocol relied) to improperly profit on transactions on the bZx Protocol.  Because bZeroX did not conduct KYC on its customers, bZeroX could not identify the individual(s) who engaged in this conduct. Relevant here, in each case, bZeroX utilized its Keys to pause trading and withdrawals, and to implement fixes to the smart contract code, to address the existing or potential losses to the bZx Protocol.

**D.  During the DAO Relevant Period, the bZx DAO (Eventually Renamed the Ooki DAO During the DAO Relevant Period) Controlled and Operated the bZx Protocol (Eventually Renamed the Ooki Protocol During the DAO Relevant Period).**

19.     On approximately August 23, 2021, bZeroX transferred control of the bZx Protocol (including relevant Keys) to the bZx DAO.  From that point forward, the bZx DAO could act with respect to the bZx Protocol only through a vote of BZRX Token holders.

20.     The bZx DAO was an unincorporated association comprised of BZRX Token holders who voted those tokens to govern the bZx Protocol.

21.     As set forth in Paragraph 5, the bZx Founders believed that transitioning to a DAO would insulate the bZx Protocol from regulatory oversight and accountability for compliance with U.S. law.

- 9 -

22. In practice, however, the bZx DAO controlled and operated the bZx Protocol just as bZeroX before it had done. Specifically:

a. The bZx Protocol continued to enable any person with a compatible digital asset wallet to contribute margin (collateral) to open leveraged positions whose value was determined by the price difference between two digital assets from the time the position was established to the time it was closed, utilizing the mechanics described in Paragraphs 10-13;

b. The bZx DAO continued to market, solicit orders for, and facilitate access to the bZx Protocol, including through individuals acting on the bZx DAO's behalf (such as the bZx Founders) and the front-end website the bZx DAO now controlled, as described in Paragraph 14;

c. The bZx DAO continued to collect the same kinds of fees, including origination fees, trading fees, and a percentage of interest paid to lenders, that bZeroX had collected, as described in Paragraph 15;

d. The bZx DAO now controlled the Keys, which enabled the bZx DAO to access and control the operation of, and the funds held in, the relevant bZx Protocol smart contracts, as described in Paragraph 16; and

e. The bZx DAO, through its front-end website, continued to advertise the lack of KYC and AML requirements as a positive feature of the bZx Protocol; offer any user anywhere in the world (including in the United States) the ability to trade on the bZx Protocol; and not take any steps to exclude U.S. persons and/or non-ECPs from the bZx Protocol, just like bZeroX before it, as described in Paragraph 17.

23.     Just as bZeroX (like any LLC) governed the bZx Protocol through the votes of its members (i.e., the bZx Founders), the bZx DAO governed the bZx Protocol through the votes of BZRX Token holders.  Specifically, any BZRX Token holder had the right to propose, and to vote his or her BZRX Tokens to effect, changes to the bZx Protocol or otherwise shape the direction of the bZx DAO's business.

24.     The general process for BZRX Token holders to govern the bZx DAO was that any new proposals were first discussed on the bZx Community Forum ("bZx Forum").  Proposals that were not widely supported typically ended there.  If there was sufficient support, a non-binding "snapshot vote" could be conducted to gauge support for a particular proposal.  If a proponent believed there was sufficient support, a binding vote could be held directly on the bZx Protocol through a fork of the Compound Bravo Governance Module smart contract that enabled BZRX Token holders to vote those tokens for or against a proposal.  Approved proposals were implemented by individuals as authorized by the bZx DAO.

25.     For example, on approximately August 24, 2021, the bZx Founders proposed in the bZx Forum that the bZx DAO approve an omnibus funding plan for going-forward bZx DAO operations—including release of funds for marketing, operations, development, community management, and legal expenses.  The proposal passed a snapshot vote unanimously, and BZRX Token holders voted to approve the proposal in September 2021.  Funds were subsequently released from the bZx DAO Treasury (which contained bZx Protocol revenue) to pay the approved expenses.

26.     Similarly, in approximately December 2021, the bZx DAO voted to utilize funds from the bZx DAO Treasury to compensate certain bZx DAO members and other users of the bZx Protocol who lost funds in connection with an alleged November 2021 security breach and theft of funds on the bZx Protocol.  (The November 2021 incident involved a spearfishing attack

- 11 -

against a bZx DAO developer through whom the perpetrator allegedly gained access to, and stole, bZx Protocol assets as well as the developer's personal assets.)

27.     On approximately December 18, 2021, through a vote of BZRX Token holders, the bZx DAO renamed itself the Ooki DAO.  This was simply a rebranding in name only (and was repeatedly described by members of the bZx DAO as merely a "rebrand") and did not result in legal changes to the DAO's business or material changes to its operations.  The Ooki DAO now operates the bZx Protocol (which the Ooki DAO has renamed the Ooki Protocol) in the exact same manner that the bZx DAO operated the bZx Protocol, for example as described in Paragraph 22.

28.     The Ooki DAO is an unincorporated association comprised of Ooki Token holders who have voted those tokens to govern the Ooki Protocol.

29.     The Ooki DAO website describes specific Ooki DAO procedures for proposing and voting on Ooki DAO governance proposals, which are consistent with the procedures utilized when the Ooki DAO was doing business as the bZx DAO, as summarized in Paragraphs 23-24.  In short, the Ooki DAO is governed by the vote of holders of Ooki Tokens, which are issued in the same manner that BZRX Tokens were issued by the bZx DAO.  Holders of BZRX Tokens have the ability to convert those tokens into Ooki Tokens.

30.     During the DAO Relevant Period, multiple Ooki DAO members have resided in the United States and have conducted Ooki DAO business (for example, voting Ooki Tokens to govern the Ooki DAO and operate the Ooki Protocol) from within the United States.

31.     During the DAO Relevant Period, the Ooki Protocol has been deployed, and is made available by the Ooki DAO, on multiple blockchains, including the Polygon and Binance Smart Chain blockchains in addition to the Ethereum blockchain.

## II.    CONCLUSIONS OF LAW

### A.  The Commission Has Established Jurisdiction and Venue.

32.    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

33.    Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because the Defendant resides or transacts business in this jurisdiction and the acts and practices in violation of the Act and Regulations occurred, are occurring or are about to occur within this District, among other places.

### B.  Default Judgment Is Warranted Against the Defendant.

34.    Rule 55(b) of the Federal Rules of Civil Procedure authorizes litigants to seek, and the Court to enter, default judgment against a party who has failed to plead or otherwise defend an action.

35.    When a court possesses subject-matter and personal jurisdiction, the decision to enter default judgment is left to the court's discretion.  *See* FRCP 55(b)(2); *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999); *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

36.    In exercising such discretion, courts in this circuit may consider the factors set forth in *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  These factors include:  (1) the possibility of prejudice to the plaintiff if the motion is denied; (2) the merits of plaintiff's

- 13 -

substantive claim; (3) the sufficiency of the complaint; (4) the amount of money at stake; (5) the possibility of a dispute concerning any material facts; (6) whether default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Id.*

37.     In assessing requests for default judgments, the well-pleaded factual allegations of the complaint are taken as true. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

38.     The Court may enter default judgment without a hearing on damages when the amount claimed is capable of ascertainment from the definite figures identified in the documentary evidence or sworn statements. *See, e.g.*, *Garden City Boxing Club, Inc. v. Aranda*, 384 F. App'x 688, 689 (9th Cir. 2010); *CFTC v. Emerald Worldwide Holdings, Inc.*, No. CV03-8339AHM, 2005 WL 1130588, at *13 (C.D. Cal. Apr. 19, 2005) (finding "no reason to hold an evidentiary hearing on damages" where declaration submitted by CFTC supported entry of requested default judgment).

39.     Regarding the first *Eitel* factor, the CFTC will be prejudiced if default judgment is not entered because it "will be deprived of the opportunity to obtain judicial resolution of its claim[s]." *Sky Billiards, Inc. v. Loong Star, Inc.*, No. EDCV 14-921 JGB (SPx), 2016 WL 6661175, at *5 (C.D. Cal. Mar. 17, 2016); *see also Halsey v. Colonial Asset Mgmt.*, No. 5:13-cv-02025, 2014 WL 12601015, at *4 (C.D. Cal. July 17, 2014) (concluding plaintiff lacked remedy in absence of default judgment where defendant failed to file responsive pleading).  The CFTC has strong, congressionally-mandated interests in enforcing the Act, ensuring compliance with registration obligations to protect members of the public from harm, and deterring future wrongdoing through penalties, among other monetary relief.  Yet the Ooki DAO's refusal to appear and defend will continue to deprive the CFTC of the opportunity to obtain judgment on

the merits.  This factor thus supports a default judgment.  *See SEC v. Fortitude Grp.,* No. 16-50, 2017 WL 818604, at *2 (W.D. Pa. Feb. 10, 2017) (granting SEC's motion for default judgment because SEC would "be prejudiced by its inability to effectively enforce federal securities laws" if motion were denied).

40.     The second and third factors also weigh in favor of default judgment.  As discussed below, the CFTC's claims are meritorious, and the Complaint is sufficient on its face to state the claims set forth therein.

41.     Fourth, "the amount of money at stake in relation to the seriousness of the defendant's conduct" weighs in favor of a default judgment.  *PepsiCo, Inc. v. Los Potros Dist. Ctr., LLC*, No. CV-07-2425, 2008 WL 942283, at *3 (D. Ariz. Apr. 7, 2008).  The civil monetary penalties the CFTC seeks from the Ooki DAO are consistent with awards and penalties in similar enforcement actions.  *See, e.g.*, *CFTC v. Laino Group Ltd. d/b/a PaxForex*, No. 4:20-cv-03317, 2021 WL 4059385, at *8 (S.D. Tex. June 30, 2021), ECF No. 21 (default order) (imposing $374,864 CMP on defendant who committed similar registration violations to those in this case, reflecting, as here, imposition of inflation-adjusted per-violation CMPs, in amounts specified by 17 C.F.R. § 143.8); *see also, e.g.*, *In re Payward Ventures, Inc. (d/b/a Kraken)*, CFTC No. 21-20, 2021 WL 4501468, at *1-3, *5 (Sept. 28, 2001) (consent order) (imposing $1.25 CMP in connection with similar registration violations to those in this case).  Moreover, the Ooki DAO's registration violations are significant and go to the heart of a regulatory regime aimed at protecting U.S. commodity markets and their users.  The CFTC's requested relief is therefore reasonable.  *See Sky Billiards*, 2016 WL 6661175, at *5 (entering default judgment and noting that the "award [was] consistent with other default judgment awards in the context of [similar cases]").

42.     Fifth, the remote possibility of a dispute as to material facts weighs in favor of a

default judgment.  The Complaint details the Ooki DAO's violations of law and transformation

into a DAO in an effort to avoid compliance obligations and regulatory enforcement.  The

Complaint alleges facts not disputed by bZeroX or the bZx Founders in the bZeroX

Administrative Order and which are largely reflected in public materials such as the Ooki DAO's

website.  Given this, the likelihood of a factual dispute on a material issue is remote.  *See also*

*Sky Billiards*, 2016 WL 6661175, at \*5 (recognizing that the defendant's failure to respond

"supports the conclusion that the possibility of a dispute as to the material facts is minimal").

43.     Sixth, there was no excusable neglect for the default because the Ooki DAO was

properly served with the Summons and Complaint, publicly discussed whether and how to

respond, and chose not to appear and defend itself.  *See* ECF No. 63 at 8-9 (Order in which this

Court concluded that "[i]f the DAO fails to appear, it will be because of its strategic decision, not

because it was unaware of the lawsuit"); *Halsey*, 2014 WL 12601015, at \*4 (recognizing that

proper service of process supports a finding that default is not due to excusable neglect).  Thus,

the Ooki DAO's default cannot be excused.

44.     Finally, the seventh *Eitel* factor—the general preference for deciding cases on the

merits—does not counsel against a default judgment here because "[d]efendant[s'] failure to

answer Plaintiffs' Complaint makes a decision on the merits impractical, if not impossible."

*PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) (noting the on-the-

merits "preference, standing alone, is not dispositive") (citation omitted).  In addition,

countervailing interests outweigh any residual interest in preserving the remote potential for a

merits decision.  "[T]he CFTC is the statutory guardian entrusted with the enforcement of the

congressional scheme for safeguarding the public interest in commodity futures markets."  *See*

*Stephen Bronte, Advisors, LLC v. CFTC*, 90 F. App'x 251, 252 (9th Cir. 2004) (internal

quotations and citations omitted).  Absent a default judgment and the concomitant penalties and

injuctive relief, the CFTC will be unable to address and deter the misconduct at issue.  This weighs in favor of a default judgment.

**C. Defendant Is Liable for Violations of the Act and Regulations as Alleged in the Complaint.**

45.     The second and third *Eitel* factors "require that plaintiffs' allegations 'state a claim on which the [plaintiff] may recover.'"  *Siwiec v. Shyun Sun*, No. CV 12-6410-CBM (MANx), 2013 WL 12130002, at *2 (C.D. Cal. Feb. 20, 2013) (quoting *Kloepping v. Fireman's Fund*, No. C 94-2684, 1996 WL 75314, at *2 (N.D. Cal. Feb. 13, 1996)).  Here, the CFTC's Complaint clearly states a claim.

**1.  Defendant Engaged in Unlawful Off-Exchange Leveraged and Margined Retail Commodity Transactions in Violation of Section 4(a) of the Act, 7 U.S.C. § 6(a) (Count One).**

46.     Virtual currencies such as ETH, DAI, and others traded on the Ooki Protocol are "commodities" under the Act.

47.     Retail commodity transactions are transactions that are entered into with, or offered to, non-eligible contract participants "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis" and which does not result in actual delivery within 28 days.  Section 2(c)(2)(D)(i), (ii)(III)(aa) of the Act, 7 U.S.C. § 2(c)(2)(D)(i), (ii)(III)(aa).

48.     Retail commodity transactions are subject to 7 U.S.C. § 6(a) "as if" they are a contract of sale of a commodity for future delivery and therefore must be executed on a regulated exchange.  Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii).

49.     7 U.S.C. § 6(a) makes it unlawful for any person to offer to enter into, enter into, execute, confirm the execution of, or conduct an office or business in the United States for the purpose of soliciting, or accepting any order for, or otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery, unless

such transaction is made on or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market for the specific commodity (i.e., a DCM).

50.     The Ooki DAO's retail commodity transactions are and were offered, entered into or executed on a leveraged or margined basis.

51.     The Ooki DAO's retail commodity transactions are and were offered to, entered into or executed with persons who are not eligible contract participants or eligible commercial entities and who are not engaged in a line of business related to virtual currencies.

52.     By the conduct described in Paragraphs 3-31 above, during the DAO Relevant Period, Defendant Ooki DAO violated and is continuing to violate 7 U.S.C. § 6(a) by:

        a.     offering to enter into retail commodity transactions;

        b.     entering into retail commodity transactions;

        c.     executing retail commodity transactions;

        d.     confirming the execution of retail commodity transactions; and

        e.     conducting an office or business in the United States for the purpose of soliciting and/or accepting any order for, and/or otherwise dealing in, any transaction in, or in connection with, retail commodity transactions;

without conducting such transactions on or subject to the rules of a board of trade that was designated or registered by the CFTC as a contract market.

    **2.  Defendant Engaged in Activities That Can Only Lawfully Be Performed by a Registered Futures Commission Merchant in Violation of Section 4d of the Act, 7 U.S.C. § 6d (Count Two).**

53.     Section 1a(28) of the Act, 7 U.S.C. § 1a(28), in relevant part, defines an FCM as any individual, association, partnership, corporation or trust that engages in soliciting or in accepting orders for "any agreement, contract, or transaction described in . . . section (2)(c)(2)(D)(i)" and, in connection

therewith, "accepts any money . . . or property (or extends credit in lieu thereof) to margin . . . trades or contracts that result or may result therefrom."

54.     Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1), in pertinent part, makes it unlawful for any person to act as an FCM unless registered with the Commission as an FCM.

55.     During the DAO Relevant Period, Defendant Ooki DAO has operated as an FCM, and is continuing to operate as an FCM, by:

    A.     engaging in soliciting or accepting orders for agreements, contracts or transactions described in section 2(c)(2)(D)(i) of the Act (retail commodity transactions); and

    B.     in or in connection with such activities, accepting money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on the Ooki Protocol platform.

56.     By the conduct described in Paragraphs 3-31 above, during the DAO Relevant Period, Defendant Ooki DAO violated and is continuing to violate 7 U.S.C. § 6d by failing to register with the Commission as an FCM.

**3.  Defendant Failed To Implement a Customer Information Program and Failed to Implement Know Your Customer and Anti-Money Laundering Procedures in Violation of Regulation 42.2, 17 C.F.R. § 42.2 (2022) (Count Three).**

57.     17 C.F.R. § 42.2 provides that every FCM "shall comply with the applicable provisions of the Bank Secrecy Act and the regulations promulgated by the Department of the Treasury under that Act at 31 CFR chapter X (2022), and with the requirements of 31 U.S.C. 5318(l) and the implementing regulation jointly promulgated by the Commission and the Department of the Treasury at 31 CFR 1026.220 (2022), which require that a customer identification program be adopted as part of the firm's Bank Secrecy Act compliance program."

- 19 -

58.     By the conduct described in Paragraphs 3-31 above, during the DAO Relevant Period, Defendant Ooki DAO violated and is continuing to violate 17 C.F.R. § 42.2 by failing to implement a Customer Information Program, failing to implement Know-Your-Customer policies and procedures, failing to implement an Anti-Money Laundering program, failing to retain required customer information, and failing to implement procedures to determine whether a customer appears on lists of known or suspected terrorists or terrorist organizations such as those issued by OFAC.

> **4.  There Is a Reasonable Likelihood That the Defendant Will Continue To Violate the Law.**

59.     With respect to each of the above violations of law, unless restrained and enjoined by this Court, there is a reasonable likelihood that the Defendant Ooki DAO will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## III.     <u>ORDER FOR RELIEF</u>

60.     The Motion is GRANTED.

**IT IS HEREBY ORDERED THAT:**

**A.  Permanent Injunction.**

61.     The CFTC is authorized to seek, and the Court to impose, injunctive relief. Section 6c of the Act, 7 U.S.C. § 13a-1(a). "The CFTC is entitled to a permanent injunction upon a showing that a violation [of the Act or Regulations] has occurred and is likely to continue unless enjoined." *CFTC v. Driver*, 877 F. Supp. 2d 968, 981 (C.D. Cal. 2012). "Once a violation is demonstrated, the [CFTC] need show only that there is some reasonable likelihood of future violations." *CFTC v. Wilson*, No. 11CV1651, 2011 WL 6398933, at *2 (S.D. Cal. Dec. 20, 2011) (quoting *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).

62.     As described above, the well-pleaded facts of the CFTC's Complaint, and the

evidence submitted through declarations, establish that the Ooki DAO's unlawful conduct makes it highly likely that it will continue to violate the Act and Regulations unless permanently restrained and enjoined by the Court.  While the Ooki DAO was clearly aware of the CFTC's Complaint—and publicly deliberated whether and how to respond to it—it ultimately chose not to appear.  Instead, it chose to continue to operate its unlawful business.

63.     Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Defendant Ooki DAO is permanently restrained, enjoined and prohibited from directly or indirectly:

      a.    offering to enter into, entering into, executing, confirming the execution of, or conducting an office or business in the United States for the purpose of soliciting, or accepting any order for, or otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery, unless such transaction is made on or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market for the specific commodity (i.e., a DCM), in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a);

      b.    acting as an FCM by (1) engaging in soliciting or accepting orders for an agreement, contract, or transaction described in Section 2(c)(2)(D)(i) of the Act, 7 U.S.C. § 2(c)(2)(D)(i); or acting as a counterparty in any agreement, contract, or transaction described in 7 U.S.C. § 2(c)(2)(D)(i); and (2) in connection with such activities, accepting any money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that may result therefrom, as described in Section 1a(28) of the Act, 7 U.S.C. § 1a(28); without having

- 21 -

ORDER OF DEFAULT JUDGMENT

registered with the CFTC as an FCM, in violation of Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1); and

c.     while acting as an FCM, failing to adopt a customer identification program as part of a Bank Secrecy Act compliance program, in violation of Regulation 42.2, 17 C.F.R. § 42.2 (2022).

64.     The Defendant Ooki DAO is also permanently restrained, enjoined and prohibited from directly or indirectly:

a.     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

b.     Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)), for its own personal account or for any account in which it has a direct or indirect interest;

c.     Having any commodity interests traded on its behalf;

d.     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e.     Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f.     Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and/or

- 22 -

g.    Acting as a principal (as that term is defined in Regulation 3.1(a),

17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any

person (as that term is defined in Section 1a((38) of the Act, 7 U.S.C.

§ 1a(38)), registered, exempted from registration or required to be

registered with the Commission except as provided for in 17 C.F.R.

§ 4.14(a)(9).

**B.  Removal of the Ooki DAO's Website.**

65.    The Ooki DAO shall remove or cause to be removed from the Internet all

webpages posted or authorized by the Ooki DAO to be posted in which the Ooki DAO offers to

enter into, enters into, executes, confirms the execution of, or conducts business in the United

States for the purpose of soliciting or accepting orders for, or otherwise dealing in, any

transaction in, or in connection with, leveraged or margined retail commodity transactions

whether through ooki.com, the Uniform Resource Locater (URL) associated with such domain

name, and/or any other domain name or URL created, operated, hosted and/or authorized by the

Ooki DAO, in whole or in part.  This includes, but is not limited to, submitting a removal request

of the domain name(s) associated with the aforementioned conduct and corresponding URL(s) to

the appropriate webhost provider and/or domain registration company.

66.    Any person or entity providing web-hosting or domain-name registration services

in the United States for any website, domain name, or affiliated URL under the ownership of the

Ooki DAO, in whole or in part, which the Ooki DAO uses to offer to enter into, enter into,

execute, confirm the execution of, or conduct business in the United States for the purpose of

soliciting or accepting orders for, or otherwise dealing in, any transaction in, or in connection

with, leveraged or margined retail commodity transactions, including, but not limited to,

ooki.com, the URL associated with such domain name, and/or any other domain name or URL

- 23 -

created, operated, hosted, and/or authorized by the Ooki DAO, in whole or in part, who receives

actual notice of this Order by personal service or otherwise shall:

      a.    Remove or cause to be removed from the Internet all webpages, within

               their control, which are posted or authorized to be posted by the Ooki

               DAO or any persons and entities insofar as they are acting in the capacity

               of agents, servants, employees, successors, assigns, or attorneys of Ooki

               DAO, in which the Ooki DAO offers to enter into, enters into, executes,

               confirms the execution of, or conducts business in the United States for

               the purpose of soliciting or accepting orders for, or otherwise dealing in,

               any transaction in, or in connection with, leveraged or margined retail

               commodity transactions;

      b.    preserve all documents related to any website operated, in whole or in

               part, under the name ooki.com, as well as any website that is substantially

               identical in appearance to that website; and

      c.    immediately notify counsel for the CFTC of any other web page or

               website operated or controlled by or on behalf of the Ooki DAO.

**C. Civil Monetary Penalty.**

67.    Based on the Ooki DAO's significant misconduct, as well as its failure to cure its

ongoing violations, the Court finds that a civil monetary penalty reflecting the maximum

permissible amount ($214,514) for its separate violations of each of the three counts set forth in

the Complaint and this Order is warranted.

68.    Accordingly, the Ooki DAO shall pay a civil monetary penalty in the amount of

six hundred forty-three thousand, five hundred forty-two dollars ($643,542) ("CMP

Obligation").  If the CMP Obligation is not paid immediately, then post-judgment interest shall

accrue on the CMP Obligation beginning on the date of entry of this Order and shall be

determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant

to 28 U.S.C. § 1961.

69.     The Ooki DAO shall pay its CMP Obligation and any post-judgment interest, by

electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank

money order.  If payment is to be made other than by electronic funds transfer, then the payment

shall be made payable to the Commodity Futures Trading Commission and sent to the address

below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> HQ Room 181
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, the Ooki DAO shall contact Marie Thorne or

her successor at the address above to receive payment instructions and shall fully comply with

those instructions.  The Ooki DAO shall accompany payment of the CMP Obligation with a

cover letter that identifies the Ooki DAO and the name and docket number of this proceeding.

The Ooki DAO shall simultaneously transmit copies of the cover letter and the form of payment

to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette

Centre, 1155 21st Street, NW, Washington, D.C. 20581, with a copy to Charles Marvine, Deputy

Director, Division of Enforcement, Commodity Futures Trading Commission, 2600 Grand

Boulevard, Suite 210, Kansas City, MO 64108.

### D.  Provisions Related to Monetary Sanctions.

70.     Partial Satisfaction:  Acceptance by the Commission/CFTC or the Monitor of any

partial payment of the Ooki DAO's Restitution Obligation, Disgorgement Obligation, or CMP

Obligation shall not be deemed a waiver of its obligation to make further payments pursuant to this Order, or a waiver of the Commission/CFTC's right to seek to compel payment of any remaining balance.

**E.  Miscellaneous Provisions**

71.     Notice:  All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to **Commission/CFTC:**

>Charles Marvine
>Deputy Director, Division of Enforcement
>Commodity Futures Trading Commission
>2600 Grand Boulevard, Suite 210
>Kansas City, MO 64108

>or, via electronic mail to OokiDAOService@CFTC.gov

Notice to **Defendant Ooki DAO:**

>So long as the Ooki DAO website remains active, notice may be provided to the Ooki DAO via the Help Chat Box on the Ooki DAO website, with contemporaneous notice through the Ooki DAO's Online Forum, in the same manner as the Court authorized for service of process in this matter.  *See* ECF No. 63.  To the extent that the Ooki DAO complies with this Order and takes down its website, the Ooki DAO is ordered to notify the CFTC via the notice provision to the Commission described immediately above of a new manner of contacting the Ooki DAO.

All such notices to the **Commission/CFTC** shall reference the name and docket number of this action.

72.     Invalidation:  If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

73.     Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by the Ooki DAO to modify or for relief from the terms of this Order.

74.     Injunctive and Equitable Relief Provisions: In accordance with FRCP 65(d)(2), the injunctive and equitable relief provisions of this Order shall be binding upon the following persons who receive actual notice of this Order, by personal service or otherwise:  (1) the Ooki DAO; (2) any officer, agent, servant, employee, or attorney of the Ooki DAO; and (3) any other persons who are in active concert or participation with any persons described in subsections (1) and (2) above.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Order for Final Judgment by Default, Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief Against Defendant Ooki DAO* forthwith and without further notice.

**IT IS SO ORDERED** on this _____day of _____, 2023.


_____
**HON. WILLIAM H. ORRICK**
**UNITED STATES DISTRICT JUDGE**

- 27 -

ORDER OF DEFAULT JUDGMENT